John J. MIDDLETON, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 83909.

Supreme Court of Missouri,
En Banc.

June 11, 2002.

Rehearing Denied Aug. 27, 2002.

William J. Swift, Asst. Public Defender, Columbia, for Appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Shaun J. Mackelprang, Asst. Attorney General, Jefferson City, Respondent.

DUANE BENTON, Judge.

A jury convicted John J. Middleton of two counts of first-degree murder and two counts of armed criminal action, for shooting Randy Hamilton and Stacey Hodge. The jury assessed two death sentences, which the circuit court imposed. This Court affirmed on direct appeal. *State v. Middleton*, 998 S.W.2d 520 (Mo. banc 1999), *cert. denied*, 528 U.S. 1167, 120 S.Ct. 1189, 145 L.Ed.2d 1094 (2000).

Defendant then moved for post-conviction relief, which was denied after an evidentiary hearing. *Rule 29.15.* This Court has exclusive jurisdiction of the appeal. *Mo. Const. art. V, sec. 10;* order of June 16, 1988. Affirmed.

## I. Facts

On direct appeal, this Court stated the following facts.

In 1995, several drug dealers were arrested in northern Missouri. Defendant, also a drug dealer, worried that informants would implicate him. He said there were "some snitches that should be taken care of," because he did not want to go back to prison. He mentioned several names, including Randy "Happy" Hamilton.

The next day, defendant and his friend, Maggie Hodges, met the two victims on a gravel road. Defendant shot Randy Hamilton in the back once with an SKS rifle. Defendant shot Stacey Hodge in the back three times. Defendant then shot Hamilton in the head, killing him. Defendant's friend killed Hodge by shooting her in the head with another SKS rifle. Both bodies were placed in the trunk of Hamilton's car. Defendant drove the car, looking for a place to dispose of the bodies. Defendant's friend followed in a truck.

Driving around, defendant saw Danny Spurling. Defendant—covered in blood and driving Hamilton's car—said that he had "taken care" of Hamilton. He asked Spurling what to do with the bodies, indicating that he might burn them in Hamilton's old house. The next morning, defendant gave Spurling the stereo from Hamilton's car, saying "they were really going to freak out when they found those two." Defendant had a written list of

names, and asked if Spurling knew anyone on the list.

A week and a half later, defendant stated "there was a narc around and they were going to take care of it." He mentioned his "hit list," and several names on it, including Hamilton, Alfred Pinegar,[1] and William Worley. Defendant offered a mutual acquaintance $3,500 to set up a meeting with Worley.

On June 25, 1995, John Thomas and defendant discussed informants at defendant's home. Defendant listed several people who "needed to be taken care of," including Hamilton, Pinegar, and Worley. Thomas noticed two SKS rifles and a box belonging to Hamilton. When Thomas asked about the box, defendant replied: "the guy who owned that box wouldn't be needing it no more."

About the same time, defendant told an Iowa friend: "I'd knowed 'Happy' for 15 [years]. He knew enough to put me away for life. I done 'Happy.'" Defendant also gave the Iowa friend several guns, including two SKS rifles, which the police later recovered.

Defendant was arrested for another murder (Pinegar's) in late June 1995. In July, Hamilton's car was found in the woods where it had been abandoned. The car stereo was missing. In the trunk were the victims' bodies. Bullet fragments from Stacy Hodge's body displayed class characteristics consistent with the SKS rifles that defendant gave away.

Awaiting trial in the county jail, defendant confessed to a fellow inmate. The inmate testified that defendant described the murders, admitted killing Hamilton and Hodge because they were informants, and acknowledged hiding their bodies and taking the rifles to Iowa.

1. Defendant was convicted of the murder of Pinegar in 1997. *State v. Middleton*, 995

## II. Standard of Review

■ In this Rule 29.15 case, defendant must prove his claims by a preponderance of the evidence. *Rule 29.15(i)*. This Court reviews, for clear error, the motion court's findings of fact and conclusions of law. *Rule 29.15(k); Moss v. State*, 10 S.W.3d 508, 511 (Mo. banc 2000). "Findings and conclusions are clearly erroneous if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Moss*, 10 S.W.3d at 511.

■ For ineffective assistance of counsel, defendant must show (1) his attorney's conduct was not reasonable, and (2) prejudice: "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 687, 698, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Courts should defer to trial counsel, and not second-guess with the benefit of hindsight. *Id.* at 689, 104 S.Ct. 2052. Reasonable trial strategy cannot be ineffective assistance of counsel. *Clayton v. State*, 63 S.W.3d 201, 206 (Mo. banc 2001).

## III. Guilt Phase

### A. Undisclosed Deals

■ Defendant claims that the prosecution did not disclose deals made for the testimony of John Thomas and Danny Spurling. "Prosecutors must disclose, even without a request, exculpatory evidence, including evidence that may be used to impeach a government witness." *State v. Robinson*, 835 S.W.2d 303, 306 (Mo. banc 1992). See also *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d

S.W.2d 443 (Mo. banc), *cert. denied*, 528 U.S. 1054, 120 S.Ct. 598, 145 L.Ed.2d 497 (1999).

215 (1963); *Rule 25.03.* "Deals"—including plea agreements negotiated with witnesses—must be disclosed. *Hutchison v. State,* 59 S.W.3d 494, 496 (Mo. banc 2001).

### 1. John Thomas

■ On June 8, 1995, Thomas was charged with selling drugs, a class B felony. On February 27, 1998, the associate circuit judge wrote this docket entry:

△ appears with counsel, Mr. Gary Allen, and waives preliminary hearing in open court. State appears by Ms. Chris Stallings, and state advises delay in prosecution due to △'s participation as witness in companion proceedings.

△ band [*sic*] over to Div. I and to appear at 9 a.m., March 17, 1998, and file to be certified to said division.

On March 17, Thomas waived arraignment and pled not guilty, with the case continued to April 21. On March 31, he testified in the trial of this case. On April 21, Thomas pled guilty to attempting to sell drugs, a class C felony. On September 10, 1998, the court suspended imposition of sentence, placing him on five years of supervised probation.

■ Defendant's trial counsel knew of Thomas's pending charge, questioning him about it at trial (as recorded on six transcript pages). Thomas denied making a deal, and blamed the local prosecutor for the delay.[2]

Defendant contends that the circumstantial evidence shows that Thomas had an undisclosed deal to testify against him. In *Commonwealth v. Strong,* an exchange of letters showed pre-trial plea negotiations. 563 Pa. 455, 761 A.2d 1167, 1170, 1174 (2000). The witness offered to plead guilty for a 36–month sentence. *Id.* at 1174. The state and the witness never reached an "ironclad" agreement. *Id.* But, after testifying, the witness received a 40–month sentence for murder and kidnapping. *Id.* Based on all the facts, the court found an "understanding," which should have been disclosed. *Id.* at 1174–75.

Here, defendant did not prove any understanding between any prosecutor and Thomas. The motion court did not clearly err.

### 2. Danny Spurling

■ When defendant was charged with the two murders, Spurling had eight pending criminal charges in Missouri. Two of the charges were dismissed in 1996, nineteen months before Spurling testified in defendant's trial. Fourteen months before testifying, he negotiated a plea agreement, pleading guilty to two charges. Twelve months before testifying, the other four charges were dismissed. No charges were pending when Spurling testified against defendant.

Defendant argues, in effect, that the pleas and dismissals can be explained only as an undisclosed deal. Defendant must, however, do more than speculate. He must show that the plea was more than the common method to resolve charges. He must demonstrate why the other charges were dismissed. Moreover, Spurling testified that he did not have a deal. Given the

---

**2.** Defendant moves this Court to take judicial notice of evidence from the Pinegar post-conviction hearing. Specifically, defendant's trial counsel testified that, when asked about the delay, the local prosecutor gave "speculation" as to the reason, but made "no real response." This evidence was not before the motion court, and cannot be considered in this appeal. *State v. Tokar,* 918 S.W.2d 753, 762 (Mo. banc) ("This evidence is not properly a part of the record before us and will not be considered because it involves matters not raised or considered at trial, or at the post-conviction relief hearing."), *cert. denied,* 519 U.S. 933, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996). The motion is overruled.

paucity of supporting evidence, the motion court did not clearly err in concluding there was no deal.

 Alternatively, defendant claims that the dismissals should have been disclosed. This claim also fails. The dismissals resolved the charges, removing Spurling's incentive to lie in order to obtain favorable treatment. *State v. Simmons*, 944 S.W.2d 165, 180 (Mo. banc), *cert. denied*, 522 U.S. 953, 118 S.Ct. 376, 139 L.Ed.2d 293 (1997). Absent evidence of an understanding, the prosecutor was not required to disclose the dismissals.

## B. Ineffectiveness of Trial Counsel

### 1. Required Mental State for First–Degree Murder

 Defendant claims his attorneys were ineffective for not arguing that he lacked the mental state required for first-degree murder.

During guilt phase, defendant called no witnesses, instead attacking the credibility of the State's witnesses. In closing, his attorney emphasized that the State did not prove the murders beyond a reasonable doubt.

During penalty phase, Dr. Lipman—a neuropharmacologist—testified that defendant's chronic methamphetamine abuse caused symptoms (delusions, hallucinations, and paranoia) functionally identical to paranoid schizophrenia. In penalty closing, defendant's attorney argued that he should not get the death penalty, invoking (1) the excessiveness of imposing additional death sentences, when he already had one (for the Pinegar murder), (2) mercy, (3) the weak evidence against him, and (4) the corrosive effect of drug use on his thought processes.

Defendant now argues that counsel was ineffective for presenting inconsistent guilt and penalty theories. He contends counsel should have asserted that he lacked the required mental state, by calling Dr. Lipman and also Drs. Murphy (a psychologist) and Daniel (a psychiatrist), who would have testified that he had brain damage and was incapable of coolly deliberating.

Defendant's attorneys actually investigated diminished-capacity and not-guilty-by-reason-of-insanity defenses. They knew of Drs. Lipman and Murphy, and their probable testimony. Counsel *chose* not to offer those defenses.

Counsel's selection of defense theories was reasonable. Sometimes, maintaining a consistent theory throughout trial is best. See *State v. Harris*, 870 S.W.2d 798, 816 (Mo. banc), *cert. denied*, 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994). Other times, two theories, or changes to accommodate trial developments, are prudent. See *Clayton*, 63 S.W.3d at 206–07. Trial counsel is in the best position to assess tradeoffs. Where counsel has investigated possible theories, courts should rarely second-guess counsel's actual choices. See *Lyons v. State*, 39 S.W.3d 32, 39 (Mo. banc) ("Strategic choices made after thorough investigation are virtually unchallengeable."), *cert. denied*, —— U.S. ——, 122 S.Ct. 402, 151 L.Ed.2d 305 (2001).

Here, counsel reasonably chose not to assert that defendant lacked the required mental state during guilt phase. Defendant's trial attorney testified that defendant (1) did not want to present that defense, and (2) asserted his innocence. His attorneys feared that innocence and lack-of-required-mental-state were inherently inconsistent.

Moreover, the argument that defendant's voluntary drug use "diminished" his capacity or rendered him insane may have offended the jury. Cf. *sec. 562.076 RSMo*

*1994*[3]; *State v. Nicklasson*, 967 S.W.2d 596, 617 (Mo. banc), *cert. denied*, 525 U.S. 1021, 119 S.Ct. 549, 142 L.Ed.2d 457 (1998). In this case, counsel testified that the jury "hated" Dr. Lipman's penalty-phase testimony:

> Lipman did a thorough job of explaining to the jury in what I thought were good anecdotal explanations about the effects of methamphetamine on a person's brain. When I look at this jury, and I remember this very clearly during Dr. Lipman's testimony, they hated us. They hated the defense. They hated Lipman. They hated the whole idea of any sort of psychological defense or any sort of psychological reason or anything having to do with the use of drugs bringing about psychological issues. It was my decision not to compound what I thought was a really bad feeling I was getting from this jury by calling a second doctor to the stand.

On cross-examination, trial counsel added:

> I didn't call [Dr. Murphy] because quite frankly the jury ..., they hated us. I could look at them and see that. I thought if I put on one more expert witness to talk about this for another, you know, lengthy period of time they would have come over the bench at us.

In sum, counsel reasonably investigated the defense that defendant lacked the required mental state. Rejecting that defense during guilt phase was reasonable trial strategy. Counsel was not ineffective.

### 2. Not Presenting Evidence Implicating Spurling

■ Defendant asserts trial counsel was ineffective for not presenting the testimony of Dan Smith and Jeremy Wyatt. Smith—a firearms expert—would have testified that the bullet that killed Stacey Hodge could have come from a Winchester 30–30 model rifle. Defendant contends this implicates Spurling, who was arrested 11 months later for threatening a woman with a Winchester 30–30.

■ Wyatt—accomplice Maggie Hodges's son—testified at the post-conviction hearing that, while they were in jail together, Spurling threatened to kill him for what his mother and defendant did to the victims. Then, Spurling admitted he committed the murders. Wyatt said he reported Spurling's confession to a deputy. However, he told no one else until after defendant's trial.

Counsel was not ineffective for not presenting these witnesses. Smith and the State's firearms expert agreed that the bullet could have come from a number of rifles. Smith's testimony suggested a possibility, which the State's expert did not foreclose.

Smith's testimony could have aided defendant only if other evidence showed Spurling had a Winchester 30–30 at the time of the murder. At most, Spurling had a Winchester 30–30 eleven months later. The motion court did not clearly err, because there was not a reasonable probability of acquittal, or a life sentence, if Smith testified.

Wyatt's testimony is even less helpful. First, according to Wyatt, Spurling wanted to kill him for defendant's and his mother's roles in the murders, but then immediately admitted killing the victims himself. The motion court did not clearly err in finding that Wyatt was unbelievable, and that reasonable counsel would not have used him.

Second, Wyatt testified that he told a deputy, but no one else. Nothing indicates that counsel should have known about

---

**3.** All statutory references are to RSMo 1994, unless otherwise indicated.

Spurling's alleged confession to Wyatt. Thus, he did not prove that counsel should have discovered Wyatt's testimony. *Morrow v. State*, 21 S.W.3d 819, 823 (Mo. banc 2000), *cert. denied*, 531 U.S. 1171, 121 S.Ct. 1140, 148 L.Ed.2d 1004 (2001).

## C. Ineffectiveness of Appellate Counsel

■ Cross-examining Thomas at trial, defense counsel asked if he immediately notified the police after seeing Hamilton's box in defendant's home. Thomas responded, "No." After defense cross-examination, the prosecutor, at a bench conference, requested permission to ask: "Why didn't you go to the police at that time," and "When did you go the police and why?" The court allowed the questions, over defense objection.

The prosecutor then elicited that Thomas was not initially concerned, thinking Hamilton had traded the box to defendant for drugs. However, he later heard that Pinegar—who defendant listed as a snitch to kill—was dead. Then, he told the police about seeing Hamilton's box in defendant's home.

In closing, the prosecutor argued that the defendant was boasting that he killed Hamilton to intimidate other informants. She noted that the disappearance of Hamilton and Pinegar corroborated his boast. The trial court overruled defense's objection "to this line of argument."

Though counsel's objections were preserved for review, appellate counsel did not brief the issue. She considered Thomas's testimony not egregious, because he did not describe the murder. She also thought defense counsel opened the door to it. She did not challenge the closing argument, because the objection was not specific.

■ Defendant believes appellate counsel was ineffective. The standard for such claims is high:

> To support a [Rule 29.15] motion due to ineffective assistance of appellate counsel, strong grounds must exist showing that counsel failed to assert a claim of error which would have required reversal had it been asserted and which was so obvious from the record that a competent and effective lawyer would have recognized it and asserted it. The right to relief ... due to ineffective assistance of appellate counsel inevitably tracks the plain error rule; i.e., the error that was not raised on appeal was so substantial as to amount to a manifest injustice or a miscarriage of justice. *Moss*, 10 S.W.3d at 514–15 (quoting *Reuscher v. State*, 887 S.W.2d 588, 591 (Mo. banc 1994), *cert. denied*, 514 U.S. 1119, 115 S.Ct. 1982, 131 L.Ed.2d 869 (1995)).

Contrary to defendant's contentions, Thomas's testimony was proper rebuttal. The discovery of Pinegar's body explained Thomas's observations and actions. When Pinegar's body was discovered, Thomas connected the snitch list with Hamilton's box. Then, he became concerned and went to the police.

Defendant claims that the prosecutor should have responded to defense's cross-examination without mentioning Pinegar. In *State v. Collins*, this Court held that, in general, other crimes should be admitted only out of "strict necessity." 669 S.W.2d 933, 938 (Mo. banc 1984). *Collins* is distinguishable. First, Thomas did not mention a crime, but testified only that Pinegar's body was found. Second, when defense intimated that defendant's possession of the box was meaningless, the discovery of Pinegar's body was strictly necessary to explain Thomas's change of mind.

Defense counsel opened the door to this admissible evidence. The prosecutor may

argue the evidence in closing. Appellate counsel was not ineffective.

### III. Penalty Phase

### A. Mitigating Evidence

#### 1. Employer and Family

 Defendant's attorneys did not contact four former employers, and two family members—an aunt and an uncle. They would have testified that defendant always had limited intellect, even before his heavy drug use. In addition, the former employers would have testified that defendant was a good worker. His aunt and uncle would add that his mother inhaled gas fumes as a child, his father was incarcerated for stealing, and his mother and her boyfriend took him to bars as a child. Defendant contends that, by a reasonable investigation, his attorneys would have discovered these witnesses, whose testimony would persuade the jury not to impose a death sentence. By not contacting them and presenting their testimony, he concludes his attorneys were ineffective.

Counsel is not ineffective as long as the investigation is reasonable. *Strickland,* 466 U.S. at 691, 104 S.Ct. 2052. Defendant's cases are distinguishable. In both cases, counsel delayed preparing for penalty phase. *Williams v. Taylor,* 529 U.S. 362, 395, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (one week before trial); *Jermyn v. Horn,* 266 F.3d 257, 308 (3rd Cir.2001) (the night before penalty phase). In *Williams,* the attorneys did not investigate records of a "nightmarish childhood," incorrectly assuming state law barred access. 529 U.S. at 395, 120 S.Ct. 1495. They did not return the phone call of a volunteer witness. *Id.* at 396, 120 S.Ct. 1495. In *Jermyn,* counsel knew that defendant had been severely abused, but did not search for witnesses. 266 F.3d at 306–07. The investigation was so bad that counsel did not

propound any particular mitigating theory. *Id.* at 308 ("counsel presented two witnesses during the penalty phase who offered the jury with little reason to spare Jermyn's life").

Here, the investigation was reasonable. Defendant's attorneys reviewed 12 boxes of materials his former attorneys gathered. These materials included deposition transcripts, some hearing transcripts, notes from witnesses, photographs, police reports, coroner reports, and forensic reports. The attorneys also reviewed his work history, engaged two mental health experts, and talked to Department of Corrections employees. Further, at the postconviction hearing, defendant did not ask lead counsel—responsible for family matters—which relatives she did contact, or how she determined whom to contact. Finally, this investigation culminated in a reasonable penalty phase defense. Defendant did not prove ineffectiveness.

#### 2. Defendant's Mother

 In the Pinegar trial, defendant's mother testified more than in this trial, including these additional facts: defendant had a blood condition at birth and during childhood; his alcoholic and often unemployed father spent time in prison, did not want a family, abused his mother, and had affairs; when defendant was five years old, he and his sister fired a gun at their father (superficially wounding him) to stop abuse of their mother; as a teenager, his mother's boyfriend, his sister's husband, and a cousin gave him alcohol and marijuana; and he once stopped a boyfriend from abusing his mother by involving a neighbor. Defendant claims his counsel was ineffective for not eliciting these facts.

 The motion court found that defendant did not present *any* evidence on this issue. In fact, defendant introduced the transcript of his mother's testimony in

the Pinegar trial, and questioned defense counsel, who did not remember reading it. Despite the motion court's oversight, an "appellate court will not order a useless remand to direct the motion court to enter a proper conclusion of law on an isolated issue overlooked by the motion court where it is clear that movant is entitled to no relief as a matter of law . . . ." *State v. Hall,* 982 S.W.2d 675, 689 (Mo.banc 1998) (quoting *White v. State,* 939 S.W.2d 887, 903 (Mo. banc 1997)), *cert. denied,* 526 U.S. 1151 (1999).

This evidence—that trial counsel did not read mother's Pinegar testimony—proves only that counsel did not learn these facts from the Pinegar trial. Defendant did not question defense counsel about her knowledge and why she chose not to elicit these facts. Defendant did not prove unreasonableness.

Even if his mother had testified to the additional facts, it is not reasonably probable that defendant would have received a life sentence. After all, the jury in the Pinegar trial sentenced him to death, despite hearing more testimony from defendant's mother. See *State v. Simmons,* 955 S.W.2d 752, 775–76 (Mo. banc 1997), *cert. denied,* 522 U.S. 1129, 118 S.Ct. 1081, 140 L.Ed. 139 (1998).

### 3. Prior Confinement

 Defendant was previously imprisoned in Iowa. His corrections counselor there would have testified that he behaved well in prison. Defendant contends counsel was ineffective for not contacting the counselor and not introducing his Iowa corrections records. Defendant claims this evidence would (1) rebut the implication he was an escape risk and (2) amelio-

rate the negative inference from his Iowa offenses.

His attorneys introduced evidence of good conduct at a Missouri correctional facility, through two witnesses, a unit manager and a psychologist. They chose not to offer the Iowa evidence, believing the Missouri evidence sufficient.

Counsel was not ineffective. The Iowa evidence mirrored the Missouri evidence, which showed that defendant can behave in prison. Also, the Iowa evidence would have emphasized his Iowa convictions. Counsel reasonably chose not to introduce cumulative evidence of defendant's good behavior in prison.

### 4. Brian Fifer

 The husband of defendant's sister testified that she received a letter from defendant.[4] According to brother-in-law, the postscript said: "if she doesn't write I'll sell this address." Brother-in-law and sister understood "sell this address" meant "he was going to put a hit on us."

Defendant claims his counsel should have contacted Brian Fifer—an Iowa cellmate, who would testify that "sell this address" is prison slang for "stop writing you." According to defendant, counsel could find Fifer through defendant's Iowa prison records, and should have known about the issue from the Pinegar trial.

As with defendant's mother, the motion court overstated by concluding he did not present *any* evidence. Defendant introduced Fifer's deposition. Even so, a remand is useless if the movant is clearly not entitled to relief as a matter of law. See *Hall,* 982 S.W.2d at 689.

---

4. Defendant moves this Court to take judicial notice of the letter, which was admitted as an exhibit in the Pinegar trial, but not in the present trial. The letter was not introduced at the post-conviction hearing, and cannot be considered in this appeal. *Tokar,* 918 S.W.2d at 762. The motion is overruled.

Defendant introduced no evidence that he told, or that his counsel should have known, that "sell this address" was not a threat. Without knowing (or being told by defendant) that the phrase had unique meaning among prisoners, counsel had no reason to question other prisoners. Counsel was not ineffective for not finding this witness.

### B. Pinegar Murder

■ Defendant argues that counsel ineffectively handled the Pinegar murder during penalty phase. The State submitted the Pinegar murder as an aggravating circumstance under section 565.032.2(1). Defendant argues that the Pinegar murder was not a proper aggravator because it occurred after these murders. See *Harris*, 870 S.W.2d at 813.

The jury found two other aggravators. Therefore, the death sentence is valid, with or without the Pinegar aggravator. *Middleton*, 998 S.W.2d at 530 & n. 3; *State v. Jones*, 979 S.W.2d 171, 186 (Mo. banc 1998), *cert. denied*, 525 U.S. 1112, 119 S.Ct. 886, 142 L.Ed.2d 785 (1999).

■ Further, the Pinegar evidence was admissible, whether or not it was an aggravator. In considering capital punishment, the jury is entitled to any helpful information. *State v. Morrow*, 968 S.W.2d 100, 114–15 (Mo. banc), *cert. denied*, 525 U.S. 896, 119 S.Ct. 222, 142 L.Ed.2d 182 (1998); see also *State v. Gilyard*, 979 S.W.2d 138, 143 (Mo. banc 1998). "The decision to impose the death penalty, whether by a jury or a judge, is the most serious decision society makes about an individual, and the decision-maker is entitled to any evidence that assists in that determination." *State v. Debler*, 856 S.W.2d 641, 656 (Mo. banc 1993).

■ A capital defendant's character is relevant in penalty phase, and may be proved with prior convictions. E.g., *Middleton*, 995 S.W.2d at 465; *Simmons*, 955 S.W.2d at 740. Defendant's conviction for a crime warranting the death penalty is relevant to his character.

Also, the details of the Pinegar murder show that the Hamilton and Hodge murders were not isolated, but steps in a common plan. Defendant listed "snitches" he intended to kill before they turned him in to the police. Pinegar and Hamilton were named. Both the plan (systematic murder) and its purpose (eliminating snitches) were relevant to the punishment decision. *Middleton*, 995 S.W.2d at 465 (Hamilton and Hodge murders were relevant to the appropriate punishment for the Pinegar murder); see also *Middleton*, 998 S.W.2d at 531.

Defendant also claims counsel should not have introduced evidence of or discussed the Pinegar murder. However, because the State could introduce the murder, counsel reasonably sought to preempt this evidence. Counsel was not ineffective.

### C. Closing Argument

#### 1. The Excessiveness Argument

■ Defendant argues counsel ineffectively argued his case to the jury. Defense counsel began her opening statement by noting the jurors would hear important new evidence: Defendant already had a death sentence. Counsel concluded by saying: "ladies and gentlemen, as ironic as you may think it seems, I'm going to come back and I'm going to ask you to spare the life of this man who's already on death row."

In closing argument, defense counsel began:

Never have had to ask a jury to spare the life of a man who's already on death row. That's exactly what I'm asking you to do. And it might be said why?

Why does it matter? And it might be said why weren't we told about this when we all came together on Monday? When it might be said that, you know, any decision you make here is going to be kind of scratched off the list by what's already gone before you as jurors.. And I'd like to talk to you about that.

Defense counsel then argued that sentencing defendant to death was wrong for various reasons, including excessiveness:

The fact of the matter is John Middleton can only be killed once. And he's already under a sentence of death.

. . .

Three sentences of death is excessive. Three sentences of death is wrong.

. . .

He's already a condemned man and you're being asked to condemn him again and again. And that's excessive. And it's wrong.

. . .

We're asking you to impose no additional death sentences. Additional sentences of death, it's such a waste. And to sentence a man to death three times, I will make this argument to you, it shows the same disregard for the sanctity of all human life that they claim.

. . .

Asking for a man to be condemned again and again and again shows disregard for the sanctity of all human life that they are claiming John showed for Al, for Randy and for Stacey.

. . .

You're never required to sentence someone to death. Never. And the jury instruction tells you that. Three sentences of death is excessive. He's a condemned man, ladies and gentlemen. You don't need to condemn him any further. As it is, he never gets out.

. . .

Ladies and gentlemen, that's evidence to support a sentence of life no matter how ironic it sounds to you, he's still a man who is loved. He's still a man who has some value. He's adjusted well to the prison in which he's going to spend the rest of his days, however limited they are. And you don't have to take any further steps to condemn this man, ladies and gentlemen.

Questioned about her strategy, counsel testified that she thought about it a lot. She found it "ironic" that a person could receive multiple death sentences. She tried to convey that repeated death sentences serve no function, because defendant can only be killed once. "Excessiveness" was one of her themes.

Defendant claims that the excessiveness argument asked the jury to spare defendant regardless of the law. He believes this constitutes ineffectiveness. See *Hall v. Washington*, 106 F.3d 742, 750 (7th Cir.), *cert. denied*, 522 U.S. 907, 118 S.Ct. 264, 139 L.Ed.2d 190 (1997). In *Hall*, counsel's penalty-phase argument attacked the death penalty generally, with few references to the facts of the case. *Id.* The court concluded the argument was unreasonable, "given its total lack of focus on Hall's individual character and record and its reliance on irrelevant religious claims." *Id.*

This case is not like *Hall*. Here, counsel adapted the excessiveness argument to particular facts. Counsel worried that the jurors would think their penalty decision was immaterial. Therefore, she addressed the "irony" of assessing multiple death sentences. She argued that additional death penalties serve no purpose. The jurors would be showing only that defendant's life was worthless to them. In her words, it was "excessive."

In addition to excessiveness, defense counsel offered other reasons not to impose additional death sentences. She invoked mercy, weaknesses in the State's evidence, and the effect of drugs on defendant and communities generally.

Counsel reasonably challenged the excessiveness of additional death penalties. She was not ineffective.

### 2. Appeals Process Argument

 In closing, the defense argued:

And it might be said that you should impose two more sentences of death to make a total of three sentences of death because maybe he won't be executed the first time around. Missouri is a killing state. We're right up there behind Texas and Florida. We kill our killers. We do that in Missouri.

. . .

In those rare instances where you might have heard somebody under sentence of death has had their life spared, chalk it up to a higher intervention.

The prosecutor responded:

Ms. Davis may be real sure that this defendant isn't going to get out, but I'm not.

MS. DAVIS [Defense Counsel]: Objection, personalization. Calls for speculation, Judge.

THE COURT: The objection will be overruled.

MS. KOCH [Prosecutor]: Ms. Davis mentioned to you about those few occasions where a person's life is spared. She didn't talk to you about the many appeals that people go through.

MS. DAVIS [Defense Counsel]: Judge, I'm going to object to the levels of appeal. That's not relevant and not been in evidence in this trial.

THE COURT: The objection will be overruled. Proceed.

MS. KOCH [Prosecutor]: She didn't talk to you about the many different levels of appeals that these cases go through. She didn't talk to you about the Federal Court of Appeals and how often those cases get overturned on appeal because they're death penalty cases. She didn't talk to you about any of that, did she?

And she didn't talk to you about escape. You heard the testimony of the unit caseworker that came in here and testified in front of you. There has been one escape from Potosi in the last three years. And what did John Middleton do when he had the opportunity in the Harrison County Jail? He tried to escape.

Defendant contends trial counsel was ineffective for opening the door to the prosecutor's response, and for not objecting on additional grounds. He also claims direct appeal counsel was ineffective for only challenging the response under *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). See *Middleton*, 998 S.W.2d at 529–30.

First, defense counsel's argument reasonably complemented her excessiveness theme. She assured the jurors that defendant would probably be executed for his prior murder conviction. The prosecutor's response properly noted that executions do not inexorably follow death sentences.

Defendant contends counsel should have objected—and appellate counsel should have argued based on the objection actually made—that the prosecutor argued facts outside the record. The prosecutor, however, did not explicitly argue a fact outside the record. Instead, she alerted the jurors to the possibility that an appellate court could reverse the conviction—a correct statement of the law in response to defendant's argument. See *State v. Richardson*, 923 S.W.2d 301, 321 (Mo. banc),

*cert. denied,* 519 U.S. 972, 117 S.Ct. 403, 136 L.Ed.2d 317 (1996).

Defendant further asserts that the prosecutor implied an untrue fact—that federal courts frequently overturn death penalty convictions—when she said: "She didn't talk to you about the Federal Court of Appeals and how often those cases get overturned on appeal because they're death penalty cases." The frequency of appellate reversal is a fact outside the record, which the prosecutor should not reference. See *State v. Storey,* 901 S.W.2d 886, 900–01 (Mo. banc 1995).

Even so, defendant was not prejudiced. The prosecutor referred to the appellate reversal rate obliquely, if at all. If the argument had been challenged, it is not reasonably probable that defendant would have received a life sentence.

Finally, defendant argues that the prosecutor improperly suggested that he could be released if not sentenced to death. The prosecutor began her rebuttal: "Ms. Davis may be real sure that this defendant isn't going to get out, but I'm not." In context, this preface refers to the possibility of appellate reversal—a correct statement of the law—and the possibility of escape—a reference to defendant's future dangerousness. *Richardson,* 923 S.W.2d at 321; *State v. Chambers,* 891 S.W.2d 93, 107 (Mo. banc 1994). The prosecutor could invoke these possibilities in responding to the defense. *Middleton,* 998 S.W.2d at 530 ("A prosecutor has considerable leeway to make retaliatory arguments in closing. A defendant may not provoke a reply and then assert error."); *State v. Roll,* 942 S.W.2d 370, 378 (Mo. banc), *cert. denied,* 522 U.S. 954, 118 S.Ct. 378, 139 L.Ed.2d 295 (1997).

In sum, the prosecutor's argument was proper rebuttal. Neither trial nor appellate counsel was ineffective for not challenging it. To the extent that the prose-

cutor implied federal courts frequently reverse death sentences, Defendant was not prejudiced.

### 3. Impose Death for the Pinegar murder

In closing, the prosecutor argued that defendant should be held accountable for all three murders. Defendant claims this encouraged jurors to impose death for the Pinegar murder, a different crime. Therefore, he concludes counsel was ineffective in not objecting.

The prosecutor properly responded to the argument that additional death sentences were excessive, by asserting that defendant should receive a death penalty for each murder. He already had a death sentence for the Pinegar murder. The prosecutor urged two more death penalties for the murders of Hamilton and Hodge. Counsel was not ineffective for not objecting.

### D. Other Ineffectiveness Claims

### 1. Not Preserving an Objection to a Question about Defendant's Truthfulness

Dr. Lipman interviewed defendant, to evaluate his mental state. During cross-examination, the State asked him if he thought defendant lied during the interview. Dr. Lipman responded "I formed the impression that he was not being entirely truthful," and "I believe so.... But I don't know that." Defense counsel objected, but did not include the issue in the motion for new trial. Therefore, the issue was not preserved for appeal.

Defendant claims counsel was ineffective for not preserving the issue, citing *State v. Link,* 25 S.W.3d 136, 143 (Mo. banc), *cert. denied,* 531 U.S. 1040, 121 S.Ct. 634, 148 L.Ed.2d 542 (2000). In *Link,* this Court

noted that a witness should not generally comment on the credibility of *another witness.* *Id.* Here, defendant was not a witness—he was the subject of expert testimony.

Dr. Lipman testified that personal history was "very important" to the evaluation. The State could explore the validity and weight of Lipman's opinion by inquiring whether defendant was untruthful during the interview. See *State v. Brooks,* 960 S.W.2d 479, 493 (Mo. banc 1997), *cert. denied,* 524 U.S. 957, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998).

The issue has no merit. Counsel was not ineffective for not preserving it. *Morrow,* 21 S.W.3d at 826.

### 2. Not Eliciting an Opinion about Defendant's Mental State from Dr. Lipman

■ Defense counsel did not ask Dr. Lipman if defendant could appreciate the criminality of his conduct or conform his conduct to the law. Defendant claims Dr. Lipman would have testified that he could not. This testimony could have supported another mitigating circumstance. See *sec. 565.032.3(6).* Thus, defendant asserts counsel was ineffective for not asking Dr. Lipman his opinion.

At the post-conviction hearing, defendant's junior attorney testified that lead counsel decided which mitigators to prove. Defendant, however, never asked lead counsel why she did not pursue the section 565.032.3(6) mitigator. Thus, defendant did not prove that counsel was ineffective.

### 3. Asking William Worley about a Grave

■ On cross-examination, defense counsel asked William Worley if he had seen a "freshly dug grave" on defendant's property. Worley responded that he saw "what looked like one," covered by boards.

Defendant believes this evidence prejudiced him, suggesting he prepared to dispose of the bodies on his property.

First, during guilt phase, the sheriff testified about a short trench on defendant's property, where someone was working on the sewer line. Asked if it could be a grave, the sheriff said "a short one," and for "a short pygmy." Thus, the jury heard that the trench was not a grave.

Second, defendant takes Worley's testimony out of context. Defense counsel elicited the information while requesting that Worley tell weird things defendant did. For example, defendant talked about "people out in the woods" (who Worley never saw), and defendant walked around his yard picking up cellophane drug packages (which were not there).

Unlike the evidence in *United States v. Villalpando,* 259 F.3d 934, 939 (8th Cir. 2001), and *State v. McCarter,* 883 S.W.2d 75, 79 (Mo.App.1994), this information either was innocuous, or supported defendant's mitigation theory. If the jury believed the sheriff, the "grave" was repair work. If the jury believed Worley, the "grave" supported counsel's argument—elaborated in closing—that drugs had made defendant "weird" and "bizarre." Counsel was not ineffective in eliciting this information.

### 4. Not Objecting to Question Suggesting Defendant Escaped from Jail Twice

■ In cross-examining defendant's prison case-worker, the prosecutor asked: "And are you aware that [defendant] had two escape attempts while he was in Harrison County jail?" The case-worker replied "No." Defendant contends counsel was ineffective for not objecting, because the evidence showed only one escape attempt.

Although the evidence indicated one attempt, defendant was not prejudiced.

The errant reference to a second escape attempt was isolated. If counsel had objected, it is not reasonably probable that defendant would have received a life sentence.

#### 5. Not Objecting to Closing Argument about Society's Drug Problem

■ In closing, the prosecutor argued: Another reason you need to give him the death penalty for both of these crimes is because you have heard a lot about drugs, not only in this trial about methamphetamine but you've probably heard on the news how bad the methamphetamine problem is. Hear all the time about labs getting shut down and how the problem keeps growing. Well, what kind of message do you send to those drug dealers out there—

The court overruled defense counsel's objection that the argument improperly invaded the province of the jury. The prosecutor continued:

> What kind of message do you send to those drug dealers out there who are [sic] keeling methamphetamine who are afraid of going to jail, afraid of getting caught when you give somebody life without parole? Not a very strong message. But you know something? When you give them the highest punishment this state has to offer, which is the death penalty, you send a message. You send a message clear and loud. We're not going to tolerate drugs and we're not going to tolerate anybody who kills because of drugs. And that's why you need to give this man, not one, but finish that circle and give him two more death penalties. Do it as an insurance policy and do it so that everybody in the northeast Missouri will know that the people of Missouri are not going to tolerate people killing to save themselves from going to jail. Because that's exactly what this man did. Exactly what he did.

Defendant asserts this argument invited the jury to sentence him to death for drug dealing—a non-capital crime. He claims counsel should have objected throughout this argument. By objecting only once, counsel was ineffective.

This claim fails. First, the court overruled counsel's first objection. Repeated objections may alienate jurors, or highlight the complained-of argument. See *State v. Tokar*, 918 S.W.2d 753, 768 (Mo. banc), *cert. denied*, 519 U.S. 933, 117 S.Ct. 307, 136 L.Ed.2d 224 (1996).

Second, the overruled objection was not appealed. *Middleton*, 998 S.W.2d at 529–30. Since defendant chose not to pursue the issue on appeal, additional objections would not have helped.

Finally, although the prosecutor initially inferred that mere drug dealing warranted capital punishment, the prosecutor soon clarified that persons who murder to facilitate drug dealing, or to avoid going to jail, deserve the death penalty. See *secs. 565.032.2(10), (14), (15), (16)*. Thus, as a whole, the argument was proper.

In sum, counsel was not ineffective for not objecting throughout the quoted portion of closing argument.

#### 6. Not Objecting to the End of the Prosecutor's Closing Argument

■ The prosecutor finished her closing argument by saying:

> It's your decision, ladies and gentlemen, but justice here absolutely demands that these two people's deaths are avenged and that they, this defendant get the death penalty for it, the highest punishment you can give for a crime like this. If you can't give the death penalty for this crime, what kind of crimes are you going to give the death penalty for?

Defendant contends this argument relied on facts outside the record, and counsel was ineffective for not objecting.

In *State v. Storey*, this Court concluded that a prosecutor improperly called a crime "the most brutal slaying in the history of this county." 901 S.W.2d at 900–01. That argument was improper because "[t]here was no evidence about the brutality of other murders in the county." *Id.* at 901.

Here, the prosecutor asked an open-ended question, inviting the jurors to consider the appropriate punishment for the crime. The prosecutor did not, however, compare this crime to other, unproven crimes. The prosecutor did not refer to facts outside the record. Therefore, counsel was not ineffective for not objecting. See *Simmons*, 955 S.W.2d at 774 (counsel was not ineffective for not objecting to similar arguments: "if all these decisions aren't cool reflection on you want this person to die, then let me tell you nothing ever is"; and "If not in this brutal murder case, if not with this piece of evidence, then when?").

### IV. Clemency

Defendant claims Missouri's clemency process is arbitrary and capricious. However, he has not yet requested clemency. His challenge is not ripe for review. See *Missouri Health Care Ass'n v. Attorney General*, 953 S.W.2d 617, 621 (Mo. banc 1997).

### V. Conclusion

The judgment is affirmed.

LIMBAUGH, C.J., WOLFF, LAURA DENVIR STITH, PRICE, and TEITELMAN, JJ., and JAMES R. DOWD, Sp.J., concur.

WHITE, J., not participating.