John J. MIDDLETON, Appellant,

v.

STATE of Missouri, Respondent.

No. SC 84005.

Supreme Court of Missouri, En Banc.

April 1, 2003.

Rehearing Denied May 27, 2003.

William J. Swift, Office of the Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Adriane D. Crouse, Asst. Atty. Gen., Jefferson City, for respondent.

LAURA DENVIR STITH, Judge.

John J. Middleton appeals from the denial of post-conviction relief from his conviction and death sentence for the first-degree murder of Alfred Pinegar. He alleges the state had an undisclosed deal with one of the key witnesses for the prosecution. He further alleges that trial counsel were ineffective in failing to challenge a juror during voir dire, in choosing not to present a diminished capacity defense in the guilt phase, in failing to present certain mitigating evidence, and in failing to object (1) to the admission of certain evidence, (2) to certain statements in closing argument, and (3) to certain jury instructions. Finally, he alleges that appellate counsel were ineffective in failing to

raise an alleged conflict of interest on the part of one of his early trial counsel whom he claimed also represented a witness against him and in failing to object to the omission of the word "knowingly" from the portion of the penalty phase instructions that submitted that the killing of Mr. Pinegar was part of an attempt by Mr. Middleton to conceal his activities as a drug dealer.

For the reasons set out below, this Court finds that the motion court did not err in denying post-conviction relief. Affirmed.

## I. BACKGROUND FACTS[1]

John Middleton was a user and dealer of methamphetamine. On June 10, 1995, police arrested several people in Harrison County, Missouri, for possession and sale of the drug. Mr. Middleton was not one of the people arrested. About ten days after the Harrison County arrests, Mr. Middleton told a friend that "the snitches around here are going to start going down." Mr. Middleton stated that he had a "hit list" and that Mr. Pinegar was on it. Two days after making these statements, Mr. Middleton told the same friend that he was "on his way to Ridgeway, Missouri, to take Alfred Pinegar fishing."

Alfred Pinegar was also a dealer of methamphetamine and was associated with Mr. Middleton as a fellow drug dealer. He lived with his fiancée, Priscilla Hobbs, in Davis City, Iowa, just north of Harrison County, Missouri. On June 23, 1995, the day of Mr. Pinegar's murder, Ms. Hobbs was driving toward her home in Davis City when she saw Mr. Middleton and his girl-

---

1. The facts concerning the murder of Alfred Pinegar were set out in detail in this Court's opinion on direct appeal of Mr. Middleton's conviction and death sentence, *State v. Middleton,* 995 S.W.2d 443 (Mo. banc 1999), *cert. denied,* 528 U.S. 1054, 120 S.Ct. 598, 145 L.Ed.2d 497 (1999). The Court repeats these facts here without quotation marks and with only minor stylistic changes and the addition of factual and procedural developments since the direct appeal was decided.

friend Maggie Hodges in a white Chevrolet 4x4 pickup traveling in the opposite direction. Priscilla Hobbs noticed that Maggie Hodges was sitting in the middle of the truck seat instead of in the right passenger's seat. When Ms. Hobbs reached her home, Mr. Pinegar was not there and the yard had been partly mowed, as if he stopped in the middle of the job. Mr. Pinegar habitually carried a twelve-gauge shotgun, and that shotgun and about $200 were missing from the home.

Around noon that same day, Wesley Booth was working in the sporting goods department of a Wal–Mart store in Bethany, Missouri. He was approached by Ms. Hodges, Mr. Middleton, and another man, presumably Mr. Pinegar. Mr. Middleton asked Mr. Booth for six boxes of nine-millimeter shells and two boxes of twelve-gauge "double-ought" buckshot. Mr. Middleton paid cash for the ammunition. During the entire transaction, Mr. Middleton was standing at the counter across from Mr. Booth.

Mr. Middleton, Ms. Hodges, and Mr. Pinegar left Wal–Mart and drove several miles northeast of Bethany near the town of Ridgeway where they parked in a field. Mr. Pinegar got out of the truck and began to run when he saw Mr. Middleton raise the twelve-gauge shotgun. Mr. Middleton shot Mr. Pinegar twice in the back. Mr. Middleton then delivered the fatal wound to Mr. Pinegar, shooting him in the face. Mr. Middleton dumped Mr. Pinegar's body over a fence. After committing the murder, Mr. Middleton and Ms. Hodges went back to the Wal–Mart store in Bethany to return the nine-millimeter ammunition. They did not return the twelve-gauge "double-ought" shotgun shells. Mr. Booth walked with Mr. Middleton to the sporting goods department, where he exchanged the nine-millimeter shells for am-

munition of another caliber. The two then walked back to the service desk to complete the exchange.

Later that afternoon, Gerald Parkhurst saw Mr. Middleton and Ms. Hodges standing next to their pickup on the side of a road north of Bethany. Claiming their pickup had broken down, Ms. Hodges asked Mr. Parkhurst if he would give them a ride. When Mr. Parkhurst agreed to give them a ride, they transferred five or six firearms to the trunk of Mr. Parkhurst's car, including the twelve-gauge shotgun Mr. Middleton had used to kill Pinegar. Mr. Parkhurst took the two to Spickard, Missouri, where they unloaded the weapons.

Two days after the murder, John Thomas visited Mr. Middleton at his home. Mr. Middleton and Mr. Thomas discussed possible undercover drug informants, and Mr. Middleton stated that "something had to be done about them." Mr. Middleton also told Mr. Thomas that he had acquired Mr. Pinegar's twelve-gauge shotgun and that Mr. Pinegar "wouldn't be needing it no more." Mr. Thomas drove Mr. Middleton to the place were the pickup truck had broken down, helped him remove a defective part, and then Mr. Middleton drove the truck away. The next day, on June 26, 1995, Mr. Pinegar's body was found. At the murder scene, police found a piece of leather fringe, an empty box of twelve-gauge shotgun shells, two expended twelve-gauge shells, a pair of sunglasses with a missing lens, and a small plastic clock with an adhesive square on the back of it.

Later, on September 11, 1995, while Mr. Middleton was in jail, Mr. Middleton told Douglas Stallsworth, a fellow inmate, that he killed Mr. Pinegar because he was afraid that Mr. Pinegar was going to "snitch" on him about his methamphetamine dealing. Mr. Middleton described

the details of Mr. Pinegar's murder. He also told Mr. Stallsworth that some fringe was missing from his leather jacket and he was worried that it had been left at the murder scene.

Mr. Middleton was charged by information with first-degree murder and armed criminal action on October 18, 1995, in the Circuit Court of Harrison County. The prosecutor later voluntarily withdrew the charge of armed criminal action. Following a change of venue to Adair County, the case went to trial on February 24, 1997. Mr. Middleton did not testify at his trial and offered no evidence in his defense. The state presented evidence that Mr. Middleton killed Alfred Pinegar in order to keep him quiet about Mr. Middleton's drug activity. Its evidence included the testimony of John Thomas and Doug Stallsworth, that Mr. Middleton admitted the murder. The jury found Mr. Middleton guilty of first-degree murder.

In the punishment phase of the trial the state presented evidence that Mr. Middleton had also murdered Randy Hamilton and Stacey Hodge, as part of his plan to eliminate "snitches" and that Mr. Pinegar's murder was wantonly vile, horrible, and inhuman, involving depravity of mind. The jury recommended a death sentence. The circuit court sentenced Mr. Middleton to death in accordance with the jury recommendation.

A few weeks later, Mr. Middleton was tried in Callaway County on two counts of first-degree murder and two counts of armed criminal action for killing Randy Hamilton and Stacey Hodge. He was convicted of both murders and received death sentences for those murders also.

This Court affirmed Mr. Middleton's conviction of the murder of Mr. Pinegar on direct appeal in *State v. Middleton*, 995 S.W.2d 443 (Mo. banc 1999), *cert. denied*, 528 U.S. 1054, 120 S.Ct. 598, 145 L.Ed.2d 497 (1999). This Court also affirmed Mr. Middleton's capital murder convictions arising out of the Callaway County case, *see State v. Middleton*, 998 S.W.2d 520 (Mo. banc 1999), *cert. denied*, 528 U.S. 1167, 120 S.Ct. 1189, 145 L.Ed.2d 1094 (2000) (Callaway County case). Last year this Court denied Middleton's post-conviction relief claims in the Callaway County case in *Middleton v. State*, 80 S.W.3d 799 (Mo. banc 2002).

In the instant case, Mr. Middleton is appealing the motion court's denial of post-conviction relief under Rule 29.15, after an evidentiary hearing, from his conviction for the murder of Mr. Pinegar. This Court has exclusive jurisdiction. Mo. Const. art. V, sec. 10; Order of June 16, 1988.

## II. STANDARDS FOR GRANT AND REVIEW OF POST–CONVICTION RELIEF

To be entitled to post-conviction relief, Mr. Middleton was required to show by a preponderance of the evidence that: (1) trial counsel failed to exercise the customary skill and diligence of a reasonably competent attorney under similar circumstances, and (2) counsel's deficient performance prejudiced the defense. *Deck v. State*, 68 S.W.3d 418, 425 (Mo. banc 2002), *citing, Strickland v. Washington*, 466 U.S. 668, 687–88, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

Mr. Middleton bears a heavy burden in establishing the first prong of the standard by a preponderance of the evidence, for he must overcome a strong presumption that counsel provided competent assistance. Rule 29.15(i); *Leisure v. State*, 828 S.W.2d 872, 874 (Mo. banc 1992), *cert. denied*, 506 U.S. 923, 113 S.Ct. 343, 121 L.Ed.2d 259 (1992). He must show "that counsel's representation fell below an objective standard of reasonableness."

*Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. To do this, Mr. Middleton must identify specific acts or omissions of counsel that resulted from unreasonable professional judgment, and the "court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance." *Id.* at 690, 104 S.Ct. 2052.

■ In regard to the second prong of the *Strickland* test, an "error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Id.* at 691, 104 S.Ct. 2052. For this reason, Mr. Middleton must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694, 104 S.Ct. 2052.

■ This Court reviews the motion court's findings and conclusions for clear error. Rule 29.15(k); *Moss v. State,* 10 S.W.3d 508, 511 (Mo. banc 2000). "Findings and conclusions are clearly erroneous if, after a review of the entire record, the court is left with the definite and firm impression that a mistake has been made." *Id.* at 511.

### III. GUILT PHASE ERRORS

Mr. Middleton alleges that a number of errors occurred in the guilt phase of the trial that merit post-conviction relief.

#### A. Undisclosed Deal

■ Mr. Middleton asserts that the prosecution had an undisclosed and unwritten "deal" that one of the prosecution witnesses, John Thomas, would receive lenient treatment on certain charges pending in Harrison County, Missouri, in return for testimony implicating Mr. Middleton. He further asserts that the prosecution failed to disclose this deal to the defense as required under Missouri and federal law. The state says the defense was aware that Mr. Thomas had pending charges at the time he testified and denies the existence of an undisclosed deal.

■ "Prosecutors must disclose, even without a request, exculpatory evidence, including evidence that may be used to impeach a government witness." *State v. Robinson,* 835 S.W.2d 303, 306 (Mo. banc 1992). *See also Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); Rule 25.03. Promises of leniency or other "deals" with witnesses are among the types of evidence that must be disclosed under these rules. *Hutchison v. State,* 59 S.W.3d 494, 496 (Mo. banc 2001).

The record does not support Mr. Middleton's assertion that the motion court clearly erred in failing to find the existence of an undisclosed deal with John Thomas in return for his testimony. The record shows that, on June 8, 1995, Mr. Thomas was charged with selling methamphetamine, a class B felony, in Harrison County. A February 27, 1998, docket entry in that case recites:

> Ä appears with counsel, Mr. Gary Allen, and waives preliminary hearing in open court. State appears by Ms. Chris Stallings, and state advises delay in prosecution due to Ä's participation as witness in companion proceedings. Ä band [sic] over to Div. I and to appear at 9 a.m., March 17, 1998, and file to be certified to said division.

On March 4, 1997, Mr. Thomas testified as a witness for the state in Mr. Middleton's murder trial. At trial, defense counsel was aware of and cross-examined Mr. Thomas about these charges and about the

existence of any deal. Mr. Thomas denied that such a deal existed. Mr. Middleton was convicted.

In support of his motion for post-conviction relief, Mr. Middleton offered additional evidence that on March 17, 1998, two weeks after his trial testimony, Mr. Thomas waived arraignment and pled not guilty to the pending charges against him, including the Class B felony charge of selling methamphetamine. Two weeks later, on March 31, 1998, Mr. Thomas testified in Mr. Middleton's separate Callaway County trial for the murders of Randy Hamilton and Stacey Hodge. The next month, Mr. Thomas pled guilty to a lesser charge of attempting to sell drugs, a class C felony. On September 10, 1998, the court suspended imposition of sentence, placing Mr. Thomas on five years of supervised probation. Mr. Middleton also offered evidence that the Harrison County prosecutor's office did not give defense counsel an answer when counsel asked why Mr. Thomas's case was still pending after two years.

Mr. Middleton says this evidence was sufficient to show the existence of an undisclosed deal by which the charges against Mr. Thomas and his punishment would be reduced in return for his testimony against Mr. Middleton. But, assuming that Mr. Middleton is correct that the motion court *could* have drawn such an inference from this evidence, Mr. Middleton has failed to show that the motion court erred in drawing a contrary inference that the evidence, while showing that Mr. Thomas received a light sentence and

that the Harrison County prosecutor might have been more forthcoming, did not reach the level of showing an undisclosed deal existed.[2]

## B. Ineffectiveness of Trial Counsel

### 1. Juror Carol Holt

Mr. Middleton claims that his trial counsel knew during voir dire that his penalty phase strategy would be based on his claim that he was suffering from a methamphetamine psychosis at the time he murdered Mr. Pinegar. He claims that trial counsel was ineffective for failing to move to strike for cause or peremptorily remove juror Carol Holt based on her answers to voir dire questions that he alleges indicated that she was unwilling to consider mental health evidence as mitigating evidence.

 A prospective juror may be excluded for cause only if the juror's views would prevent or substantially impair the performance of his or her duties as a juror in accordance with the instructions and oath. *State v. Rousan,* 961 S.W.2d 831, 839 (Mo. banc 1998), *cert. denied,* 524 U.S. 961, 118 S.Ct. 2387, 141 L.Ed.2d 753 (1998). The qualifications of a prospective juror are not determined conclusively by focusing on a single response, but are considered in the context of the entire examination. *Middleton,* 995 S.W.2d at 460.

Mr. Middleton points to the following exchange between defense counsel and Ms. Holt in support of his argument:

Q. Is your view of the death penalty—do you have strong views on the death penalty?

**2.** On appeal of denial of post-conviction relief in the Callaway County case, *Middleton v. State,* 80 S.W.3d 799, 805 (Mo. banc 2002), this Court also rejected Mr. Middleton's very similar claim regarding the state's alleged failure to reveal a deal with Mr. Thomas, finding, as the Court does here, that the record did not support Mr. Middleton's claim that there was an "understanding" between

prosecutors and Mr. Thomas that he would receive leniency for testifying against Mr. Middleton in Mr. Middleton's Callaway County murder trial. The only evidence offered here that was not offered in that case is the evidence of the Harrison County prosecutor's silence when asked why Mr. Thomas' sentencing was delayed for two years. This additional evidence does not require a different result.

A. Yes. I think that I agree with this lady here in the green pants.

Q. Ms. Adams?

A. Yeah. We're talking in generalities right now, and we haven't discussed exactly what we're talking about. And I think sometimes we have to view what the circumstances are before we can say what we would choose to do.

Q. We're not asking you to tell us what you would choose to do. And I understand, it's frustrating. And I understand your frustration. And it's a difficult thing to question people about, but we need to have an idea of people's views on this issue.

A. I understand. You've had some really difficult questions and we're talking about something very serious. It's a tremendous responsibility. And to just say what I think I would do in that situation would be you can't really know until you view all of those things. And there are certain situations, certain circumstances that don't warrant the death penalty and I think there are some that do.

Q. Do you think—And I'll ask you some of the questions I've asked others about mitigating factors. Do you think if you were asked to evaluate mitigating factors, that mental health type of evidence is something you could consider?

A. Yes. I think I could, but I also think that sometimes it's used by lawyers to manipulate the system. You know what I'm saying? And I think that you have to really look at all the evidence and all of the things that are posed to you. But I think, yes, there are some. There are not as many as what we allow, I think.

Q. And it sounds like you're saying what you said earlier, that sometimes you need to really evaluate something before you can know how you can react?

A. Yes.

Q. Do you think if you were asked to consider, as mitigation, issues of drug and alcohol use, is that something you could consider?

A. I can't say for sure. I can't say—I can say "yes" but I just don't know.

Mr. Middleton contends that this exchange shows that Juror Holt was unwilling to or unsure she could consider evidence supporting his defense that he was not fully responsible for his acts because he was suffering from methamphetamine psychosis at the time of the crime. But, the exchange does not so demonstrate.

 Defense counsel first asked Juror Holt generally about whether she could consider mental health evidence as a mitigating factor. She said she could, but some uses of it she believed went too far. Counsel then asked whether she could consider drug and alcohol use in particular as evidence in mitigation, and she said she could not say for sure. If general use of drugs and alcohol was itself a statutory mitigating circumstance, this would be a cause for concern. But, drug or alcohol use constitutes a statutory mitigating circumstance only if it rises to the level of causing a psychosis. *See sec.* 565.032. Juror Holt was not asked, and did not state, that she would not consider the fact defendant suffered from drug or alcohol psychosis as a mitigating factor if the law so required, or that she would not follow the law in this regard. "The relevant inquiry is whether a prospective juror can follow the law." *State v. Chaney,* 967 S.W.2d 47, 57 (Mo. banc 1998), *cert. denied,* 525 U.S. 1021, 119 S.Ct. 551, 142 L.Ed.2d 458 (1998). In effect, defense counsel suggests that, be-

736

cause defendant planned to argue that his use of alcohol and drugs should be considered as mitigating, therefore he had a right to ask each juror to commit that they would in fact consider such drug or alcohol use to be mitigating. But, the relevant law and penalty phase jury instructions only require that a juror "shall consider any evidence which he considers to be aggravating or mitigating." [3] They do not require the juror to specify, in advance of the evidence, which evidence he thinks he will consider to be aggravating or mitigating. Juror Holt was not required to commit at the voir dire stage that she would consider evidence of alcohol and drug use in mitigation of punishment. Counsel was not ineffective for failing to move to strike her for cause.

■■■ Because Juror Holt was qualified, Mr. Middleton cannot show that he was prejudiced by counsel's decision not to peremptorily remove her from the jury. Mr. Middleton was only entitled to a panel of jurors who were qualified, not to his favorite jurors among those who were qualified. *Ham v. State,* 7 S.W.3d 433, 438–440 (Mo. App. W.D.1999). He has not shown that it is reasonably probable that the result of the trial would have been different had another venire member sat on the jury in the place of Juror Holt.

**2. Required Mental State for First–Degree Murder**

In the guilt phase, Mr. Middleton's defense focused on a claim that he was innocent of the killings. Once he was convicted, in the *penalty phase* his counsel relied on the testimony of Dr. Lipman, a neuropharmacologist, and Dr. Murphy, a psychologist. Dr. Lipman testified that Mr. Middleton's chronic methamphetamine abuse caused symptoms functionally identical to paranoid schizophrenia.

Dr. Murphy testified that Mr. Middleton's methamphetamine use caused an organic paranoid thought disorder that caused him to be psychotic.

Mr. Middleton claims that his attorneys were ineffective for not also calling Dr. Lipman and Dr. Murphy, as well as Dr. Daniel, a psychiatrist, in the *guilt phase* in support of an argument that, due to his drug use and resulting brain damage, he lacked the deliberative capacity required for first-degree murder. He also alleges they were ineffective for presenting different, and inconsistent, theories in the guilt and penalty phases.

The record at the post-conviction hearing showed that defense counsel knew of Dr. Lipman and Dr. Murphy and their probable testimony and investigated using diminished capacity and not-guilty-by-reason-of-insanity defenses in the guilt phase, but made a specific strategic decision not to offer these defenses, and to instead attempt to win an acquittal by attacking the credibility of the state's witnesses and arguing the insufficiency of the evidence.

■■■ Where counsel has investigated possible strategies, courts should rarely second-guess counsel's actual choices. Trial counsel is normally in the best position to assess the tradeoffs involved in selecting particular defenses. Thus, while maintaining a consistent theory throughout trial may often be the best approach, *see State v. Harris,* 870 S.W.2d 798, 816 (Mo. banc), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994), at other times it may be prudent to change strategies to accommodate trial developments. *See Clayton v. State,* 63 S.W.3d 201, 206–07 (Mo. banc 2001), *cert. denied,* 535 U.S. 1118, 122 S.Ct. 2341, 153 L.Ed.2d 169 (2002). These types of strategic choices, "made after thorough investigation are vir-

**3.** *Sec.* 565.032.1(2).

tually unchallengeable." *See Lyons v. State*, 39 S.W.3d 32, 39 (Mo. banc), *cert. denied*, 534 U.S. 976, 122 S.Ct. 402, 151 L.Ed.2d 305 (2001).

▮ Here, the motion court did not err in concluding that trial counsel did not act unreasonably in making the strategy decision not to assert that Mr. Middleton lacked the required mental state during the guilt phase. Defense counsel testified that Mr. Middleton did not want them to present either a diminished capacity or a not-guilty-by-reason-of-insanity defense in the guilt phase and that he was adamant about his innocence. They testified that Mr. Middleton threatened to act up if they ever attempted to tell the jury he was responsible for Mr. Pinegar's death during the guilt phase.

Counsel further testified that they did not present these defenses in the guilt phase because they believed that arguing innocence might be effective and feared that use of a lack-of-mental-state defense would distract from and might be inherently inconsistent with Mr. Middleton's insistence on an innocence defense. Finally, the Court notes that, after reviewing possible trial strategies, and for similar reasons, Mr. Middleton's independent counsel in the Callaway County case determined that the approach taken in the instant case was the best approach to take in that case also. *See Middleton*, 80 S.W.3d at 806. Defense counsel were not ineffective in choosing this defense just because the jury came back with a guilty verdict. The court did not err in rejecting this ground for post-conviction relief.

### C. Ineffectiveness of Appellate Counsel

Prior to trial, Mr. Middleton unsuccessfully sought to exclude the testimony of state witness Doug Stallsworth on the basis that public defender Darren Wallace of the Chillicothe Public Defender's Office allegedly represented both Mr. Middleton and Mr. Stallsworth when Mr. Stallsworth furnished the state with evidence that incriminated Mr. Middleton. Mr. Middleton claims appellate counsel was ineffective for not raising this claim of error on direct appeal.[4]

Here, the record does not support Mr. Middleton's claim that Mr. Wallace was representing Mr. Middleton at the time Mr. Stallsworth furnished the state with evidence that incriminated Mr. Middleton. Rather, it reveals that Mr. Wallace was permitted to withdraw as Mr. Middleton's counsel on July 27, 1995. That same day, new counsel from the central unit capital division office of the public defender entered an appearance for Mr. Middleton. So far as the record shows, Mr. Stallsworth did not furnish law enforcement with the incriminating evidence until September 19, 1995, almost two months later. For this reason, appellate counsel would not have been successful in arguing that the trial court erred in admitting the testimony of Mr. Stallsworth. Thus, counsel was not ineffective in choosing not to raise this point on appeal.

### IV. PENALTY PHASE

#### A. Failure of Trial Counsel to Present Mitigating Evidence

##### 1. Mitigating Evidence Testimony of Employer and Family.

▮ Mr. Middleton claims that counsel was ineffective for not contacting and presenting the testimony of four for-

---

4. Mr. Middleton's *in limine* motion to exclude the testimony of Bobby Henderson and Danny Spurling on the same basis was also unsuc-

cessful, but Mr. Stallsworth was the only one of the three that actually testified at trial.

mer employers and two family members, an aunt and an uncle. Counsel are not ineffective so long as their investigation is reasonable. *Strickland*, 466 U.S. at 691, 104 S.Ct. 2052.

Here, counsel conducted a reasonable investigation that culminated in a reasonable penalty phase defense. Not only did counsel speak with Mr. Middleton on several occasions prior to trial, they contacted his mother, contacted several of Mr. Middleton's recent friends and acquaintances, engaged the aid of two mental health experts, and contacted the sheriff of Adair County, where Mr. Middleton was held during the course of the trial.

Based upon this investigation, counsel determined that their best strategy in the penalty phase was to elicit testimony that would establish Mr. Middleton was under a methamphetamine-induced psychosis at the time of the killing. To this end, counsel presented the testimony of two mental health experts, Mr. Middleton's mother, his brother-in-law, and a friend, all providing testimony to support Mr. Middleton's drug-induced psychosis defense. In an attempt to show that Mr. Middleton was amenable to incarceration, counsel elicited testimony from the sheriff of Adair County, who, having supervised Mr. Middleton during the course of his trial, testified to his ability to adjust to incarceration.

The additional witnesses that Mr. Middleton says should have been contacted and called to testify would have stated that Mr. Middleton always had limited cognitive abilities, even before his heavy drug use. In addition, the former employers would have testified that he was a good worker. Mr. Middleton's aunt and uncle would have added that his mother had a habit of inhaling gas fumes when she was a child and that his mother and her boyfriend took him to bars as a child.

■ Defense counsels' decision not to present this additional evidence did not require a finding by the motion court that counsel were ineffective. Counsel testified that because their strategy was to present evidence supporting a defense of methamphetamine-induced psychosis, they were not interested in "good employee" evidence. Counsel cannot be said to have been ineffective in making reasonable strategic choices and decisions as to what evidence to present. *See Lyons*, 39 S.W.3d at 39. The testimony that Mr. Middleton's aunt and uncle would have provided largely would have duplicated much of Mr. Middleton's mother's and Dr. Lipman's testimony regarding Mr. Middleton's childhood and mental slowness. For this reason, the cases cited by appellant in which counsel did little or no investigation and presented little or no mitigating evidence are not on point. Counsel in Mr. Middleton's case cannot be said to be ineffective for not presenting cumulative evidence about Mr. Middleton's childhood and mental condition. *Skillicorn v. State*, 22 S.W.3d 678, 683 (Mo. banc 2000), *cert. denied*, 531 U.S. 1039, 121 S.Ct. 630, 148 L.Ed.2d 538 (2000).[5]

## 2. Good Conduct During Prior Confinement.

■ Mr. Middleton argues that counsel was ineffective for not contacting Mr. Middleton's Iowa corrections counselor and for not introducing his Iowa corrections records because this would have shown good

---

5. For similar reasons, this Court rejected Mr. Middleton's augment in the Callaway County case, *Middleton*, 80 S.W.3d at 809, that defense counsel were ineffective for failing to present similar testimony. The Court further notes that here, unlike in the Callaway County case, defense counsel did present testimony from Mr. Middleton's mother. In both cases, the jury came back with a recommendation that the death penalty be imposed.

conduct in Iowa prisons and, thus, would have supported the argument that life imprisonment rather than death would be an appropriate punishment.

Counsel in Mr. Middleton's Callaway County trial for the murders of Mr. Hamilton and Ms. Hodge also failed to introduce evidence concerning Mr. Middleton's conduct while imprisoned in Iowa. What this Court said in that case on appeal in affirming denial of post-conviction relief is equally applicable here. In both cases, counsel chose to introduce evidence of Mr. Middleton's good conduct at a Missouri correctional facility. Such evidence was more recent in time than the Iowa evidence and made the same point. For this reason:

> Counsel was not ineffective. The Iowa evidence mirrored the Missouri evidence, which showed that defendant can behave in prison. Also, the Iowa evidence would have emphasized his Iowa convictions. Counsel reasonably chose not to introduce cumulative evidence of defendant's good behavior in prison.

*Middleton,* 80 S.W.3d at 810. This same analysis applies here. Counsel was not ineffective in failing to introduce the evidence of defendant's behavior while in prison in Iowa. *Skillicorn,* 22 S.W.3d at 683.

### B. Failure to Object of Trial Counsel and Related Errors

**1. "P.S. She'll write or I'll sell this address."**

During the penalty phase, defense counsel called Mr. Middleton's brother-in-law, Paul Oglesbee, who was married to Mr. Middleton's sister Rose, to describe the symptoms that he observed Mr. Middleton display when Mr. Middleton was a user of methamphetamine. On cross-examination, the state, attempting to show that Mr. Middleton continued to be aggressive even after he stopped using methamphetamine,

questioned Mr. Oglesbee about a letter that Mr. Middleton wrote the Oglesbees that contained the phrase, "P.S. She'll write or I'll sell this address." During cross-examination, Mr. Oglesbee testified that he believed that Mr. Middleton meant this phrase to be a threat—that he was "putting a contract on us for a hit."

 Mr. Middleton contends that the motion court clearly erred in denying multiple claims related to the prosecution's use of the letter. First, he argues that counsel was ineffective for failing to object to Mr. Oglesbee's testimony that he and his wife thought the phrase meant that Mr. Middleton was going to place a hit on them. Much of his argument presupposes that the phrase did not constitute a threat. Clearly, however, Mr. Oglesbee believed it was a threat. In considering capital punishment, the jury is entitled to a wide range of helpful information. *State v. Morrow,* 968 S.W.2d 100, 114–15 (Mo. banc), *cert. denied,* 525 U.S. 896, 119 S.Ct. 222, 142 L.Ed.2d 182 (1998). *See also State v. Gilyard,* 979 S.W.2d 138, 143 (Mo. banc 1998). "The decision to impose the death penalty ... is the most serious decision society makes about an individual, and the decision-maker is entitled to any evidence that assists in that determination." *State v. Debler,* 856 S.W.2d 641, 656 (Mo. banc 1993). Evidence that Mr. Middleton made such a threat was relevant and admissible on the issue of defendant's character. *See State v. Clay,* 975 S.W.2d 121, 132 (Mo. banc 1998), *cert. denied,* 525 U.S. 1085, 119 S.Ct. 834, 142 L.Ed.2d 690 (1999).

 Second, Mr. Middleton alleges counsel was ineffective for failing to refute Mr. Oglesbee's testimony by calling Brian Fifer, who was a fellow inmate of Mr. Middleton's when Mr. Middleton was incarcerated in Iowa. He alleges that Mr. Fifer would have testified that the phrase "I'll sell this address" is not a threat, but is

merely jailhouse slang for "if you don't write me back, I will not continue to write you." This claim is also without merit. As this Court ruled in rejecting an identical claim on appeal of denial of relief in the Callaway County case:

Defendant [Mr. Middleton] introduced no evidence that he told, or that his counsel should have known, that "sell this address" was not a threat. Without knowing (or being told by defendant) that the phrase had unique meaning among prisoners, counsel had no reason to question other prisoners. Counsel was not ineffective for not finding this witness [Brian Fifer].

*Middleton,* 80 S.W.3d at 810. Here, also, Mr. Middleton has offered no evidence that he told counsel that "sell this address" was not a threat or that he informed counsel about the existence of Mr. Fifer and the latter's ability and willingness to testify. Accordingly, the court did not err in finding counsel was not ineffective in failing to call Mr. Fifer.

■ Third, Mr. Middleton claims that the letter constituted non-statutory aggravating circumstances that he should have had prior notice of, but was not informed of until the day of Mr. Oglesbee's testimony, and therefore it should not have been admitted. This constitutes a claim of trial error in admission of the document. Such claims must be raised on direct appeal and are not cognizable in a post-conviction motion. *State v. Carter,* 955 S.W.2d 548, 555 (Mo. banc 1997), *cert. denied,* 523 U.S. 1052, 118 S.Ct. 1374, 140 L.Ed.2d 522 (1998).

Finally, perhaps because he is aware of this rule, Mr. Middleton also alleges that appellate counsel was ineffective for failing to argue on appeal that he was prejudiced

by the prosecution's late disclosure of the letter. But, the trial judge addressed this issue and determined that the letter was timely disclosed as soon as the prosecution received it and that defense counsel had been made aware of the letter and its contents during the Oglesbees' depositions. Mr. Middleton offers no reason why the trial judge's determination of timely disclosure was erroneous and, if raised, would have led to reversal.

### 2. Evidence of Other Murders.

■ Mr. Middleton claims that counsel was ineffective for failing to object to certain statements by the prosecution in penalty phase opening statement and closing argument, and to the testimony of certain penalty phase witnesses, that referred to the murders of Mr. Hamilton and Ms. Hodge. He argued that this argument and testimony was inadmissible and improper because he had not yet been convicted of the Hamilton and Hodge murders at the time of his trial for the murder of Mr. Pinegar.

On direct appeal, Mr. Middleton claimed error in overruling his counsels' objection to admission of other evidence of the Hamilton and Hodge murders.[6] This Court rejected that argument, holding: "The evidence in question was used to help the jury to understand the prior acts of Middleton for the purpose of determining punishment for the murder of Pinegar. *See* [*State v.*] *Parker,* 886 S.W.2d [908] at 924 [ (Mo. banc 1994) ]; *State v. Leisure,* 749 S.W.2d 366, 378–79 (Mo. banc 1988). The trial court did not abuse its discretion by admitting this evidence." *Middleton,* 995 S.W.2d at 463. Similarly, here, the evidence that Mr. Middleton now says coun-

---

6. Specifically, Mr. Middleton objected to the admission of a videotape of the crime scene where the bodies of Stacey Hodge and Randy

Hamilton were found and a photograph of Stacy Hodge's body.

sel should have objected to was relevant to defendant's character and was admissible on that basis. *See, e.g., Morrow,* 968 S.W.2d at 114–15. Counsel cannot be deemed ineffective for failing to make a meritless objection. *Clay,* 975 S.W.2d at 136.

### 3. Credibility Evidence.

■ Mr. Middleton also argues trial counsel was ineffective in failing to object to a series of answers given by defense expert Dr. Lipman during cross-examination by the prosecutor, relating to whether Dr. Lipman believed defendant's statements made to him during an interview Dr. Lipman conducted during psychiatric testing of Mr. Middleton, because they required the expert to usurp the role of the jury in determining witness credibility. Dr. Lipman said that he believed that "He was lying about—in my opinion—the things that he was doing at the times those killings occurred. . . ."

While counsel did not object to admission of this testimony at trial, counsel did object to similar testimony by another expert, Dr. Murphy, that the doctor thought Mr. Middleton was lying when discussing the murders. This Court found no error in admission of this evidence because it concerned Mr. Middleton's truthfulness in answering the doctor's questions, not his truthfulness at trial. This Court noted that counsel for defendant had opened the door to this testimony by eliciting testimony on direct examination that Dr. Murphy did not see any evidence of malingering or faking when interviewing Mr. Middleton. The judge, therefore, properly permitted the state to explore the doctor's opinions about Mr. Middleton's truthfulness on cross-examination. *Middleton,* 995 S.W.2d at 458–59.

■ Here, counsel did not object to the admission of similar cross-examination of Dr. Lipman, but had counsel done so the result would have been the same. Because the testimony did not concern Mr. Middleton's veracity at trial but rather Dr. Lipman's assessment of whether he believed what he was told during psychological testing, and because defense counsel opened the door to such evidence by asking about Mr. Middleton's credibility, it was a proper subject of cross-examination, and counsel was not ineffective in failing to object to it. *Id.; State v. Barnett,* 980 S.W.2d 297, 307 (Mo. banc 1998), *cert. denied,* 525 U.S. 1161, 119 S.Ct. 1074, 143 L.Ed.2d 77 (1999). "Wide latitude is afforded the cross-examination of witnesses to test qualifications, credibility, skill or knowledge, and the value and accuracy of the expert's opinion." *State v. Brooks,* 960 S.W.2d 479, 493 (Mo. banc 1997), *cert. denied,* 524 U.S. 957, 118 S.Ct. 2379, 141 L.Ed.2d 746 (1998).

### C. Failure to Object to Closing Argument

■ Mr. Middleton also contends that counsel was ineffective for failing to object to comments the prosecution made during its closing argument during the penalty phase of the trial. First, he contends that the following is an improper personalization and implies special knowledge:

Paranoia is fear; it is fear. And did this defendant have or act paranoid, think paranoid things? Yes. Was he as paranoid as he led these doctors to believe? I doubt it, and I think you should doubt it. I think you should read the letters, recall the letters that he wrote to his sister from jail—fairly sophisticated manipulations, fairly sophisticated manipulations. "People are trying to frame me"; "I don't know why you won't come to see me"; "I found Jesus Christ now." That is manipulation.

This argument was not improper. The prosecution was permitted to argue reasonable inferences from the evidence. Here, the evidence that the prosecutor cited could be interpreted as evidence of manipulation, and the prosecutor did not go beyond appropriate bounds in so arguing to the jury. *Cf. State v. Kenley,* 952 S.W.2d 250, 272 (Mo. banc 1997), *cert. denied,* 522 U.S. 1095, 118 S.Ct. 892, 139 L.Ed.2d 878 (1998) (prosecutor may make statements drawn from evidence).

■ Mr. Middleton also contends that there was no evidence to support the prosecutor's statement in closing argument that Stacey Hodge was "moaning in agony before she [was] finally finished off by Maggie." Again, however, the evidence did support this inference. Doug Stallsworth testified during the penalty phase that when Ms. Hodge got out of the car, Mr. Middleton shot her and "[t]hen when she fell down and was kind of suffering, and moaning, and stuff they walked over and Maggie shot her in the head." Counsel did not improperly use this argument to suggest a personal danger to the jury or their families. *State v. Rhodes,* 988 S.W.2d 521, 528 (Mo. banc 1999).

### D. Failure to Object to Penalty Phase Instructions

#### 1. Failure to Submit "Knowingly".

■ Mr. Middleton contends that counsel failed to object that Instruction No. 15 in the penalty phase did not properly define the crime of delivery of a controlled substance, as MAI–CR 3d 325.04.1 requires a jury to find defendant "knowingly" delivered a controlled substance. Instruction 15, provided, in relevant part:

In determining the punishment to be assessed against the defendant for the murder of Alfred Pinegar, you must first unanimously determine whether one or more of the following statutory aggravating circumstances exists:

. . . .

2. Whether the defendant murdered Alfred Pinegar for the purpose of concealing or attempting to conceal the defendant's delivery of methamphetamine, a controlled substance.

A person commits the crime of delivery of a controlled substance when he delivers a controlled substance knowing that the substance is a controlled substance. . . .

While Mr. Middleton is correct that the last-quoted sentence of the instruction should have placed the word "knowingly" before the words "delivers a controlled substance," he was not prejudiced by counsel's failure to object to this instruction. Here, the fact that Mr. Middleton used and sold methamphetamine was conceded in the penalty phase and evidence to this effect was even elicited by defense counsel to support the claim of methamphetamine psychosis. Accordingly, prejudice did not result from omission of the word "knowingly" and Mr. Middleton's claim is without merit. *State v. Roberts,* 948 S.W.2d 577, 588 (Mo. banc 1997), *cert. denied,* 522 U.S. 1056, 118 S.Ct. 711, 139 L.Ed.2d 652 (1998) ("When a defendant makes a voluntary judicial admission of fact before a jury, it serves as a substitute for evidence and dispenses with proof of the actual fact and the admission is conclusive on him").[7]

7. Mr. Middleton also contends that appellate counsel was ineffective for not raising as plain error the failure to submit the mental element of acting knowingly in Instruction No. 15. As this Court has found no prejudice resulted from the failure to include this element in the instruction, counsel cannot be found ineffective in failing to raise this issue on appeal. *Skillicorn,* 22 S.W.3d at 689.

### 2. Juror Inability to Understand Penalty Phase Instructions.

Mr. Middleton also claims that trial counsel was ineffective for failing to challenge the penalty phase instructions by presenting the studies of Dr. Richard Wiener, which purportedly demonstrate that jurors have difficulty understanding Missouri's penalty phase instructions and, as a result, are more likely to recommend death. For the reasons stated in *Lyons v. State*, 39 S.W.3d at 43–44; *State v. Deck*, 994 S.W.2d 527, 542–43 (Mo. banc 1999), *cert. denied*, 528 U.S. 1009, 120 S.Ct. 508, 145 L.Ed.2d 393 (1999); and *State v. Jones*, 979 S.W.2d 171, 181 (Mo. banc 1998), *cert. denied*, 525 U.S. 1112, 119 S.Ct. 886, 142 L.Ed.2d 785 (1999), in which nearly identical arguments were raised, this argument is rejected.

### V. CLEMENCY

Mr. Middleton claims Missouri's clemency process is arbitrary and capricious. For the reasons stated in *Middleton*, 80 S.W.3d at 817 (Mo. banc 2002), this claim is rejected also.

### VI. CONCLUSION

For the reasons set out above, the judgment is affirmed.

All concur.