**STATE of Missouri, Plaintiff–Respondent,**

v.

**James TILLEY, Defendant–Appellant.**

**No. 24804.**

Missouri Court of Appeals,
Southern District,
Division Two.

May 22, 2003.

---

Lisa M. Stroup, Assistant State Public Defender, St. Louis, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Richard A. Starnes, Assistant Attorney General, Jefferson City, for respondent.

KENNETH W. SHRUM, Judge.

A jury found James Tilley ("Defendant") guilty of attempting to manufacture methamphetamine (§ 195.211), possession of methamphetamine (§ 195.202), and possession of precursor ingredients for methamphetamine with the intent to manufacture that drug (§ 195.420).[1] Because he was proven to be a prior and persistent offender, the trial judge imposed sentence.

Defendant appeals and presents issues about the following: (1) defense counsel's alleged conflict of interest arising from his

---

1. All statutory references are to RSMo (2000), unless otherwise stated.

representation of a co-defendant; (2) sufficiency of the evidence to support Count I (§ 195.211) and Count III (§ 195.420); (3) a request for plain error review of his double jeopardy claim; and (4) the trial court's refusal to admit a letter which was not disclosed to the State. This court affirms.

## STANDARD OF REVIEW

This court reviews the facts in the light most favorable to the verdict. *State v. Withrow*, 8 S.W.3d 75, 77 (Mo.banc 1999). In doing so, we afford the State the benefit of all favorable inferences drawn from the evidence and disregard all evidence and inferences to the contrary. *Id.* "An inference is a logical and reasonable conclusion of a fact not presented by direct evidence but which by the process of logic and reason, a trier of fact may conclude exists from the established facts." *State v. Hyde*, 682 S.W.2d 103, 106[8] (Mo.App. 1984). Although an inference only satisfies a party's burden of producing evidence with regard to a particular fact, a trier of fact may accept existence of the assumed fact. *Id.* at 106[9].

## FACTS

On April 13, 2001, deputy sheriff Sullivan ("Sullivan") learned via a female informant that she had been at Defendant's house "the night before." While she was there, she received methamphetamine that "was pulled from underneath the cabinet between the kitchen and the living room."

Based on that information, Sullivan and sheriff's deputy Penrod ("Penrod") went to Defendant's house at 1666 County Road 216 near Chaffee, Missouri. When they arrived, Defendant "was on the roof of a shed that was just southwest of the residence." Another person (later identified as Roger Graviett) came out the front door of the house. Penrod moved toward Graviett to speak with him, while Sullivan went to the shed to talk to Defendant.

Sullivan testified he "hollered up to" Defendant and asked him to come down and talk. Defendant stepped to the edge of the shed roof and stated he would come down. Thereon, Defendant turned and walked away from the roof edge. Sullivan anticipated Defendant was proceeding to the back of the shed where a ladder was located; consequently, Sullivan went to meet Defendant at the bottom of the ladder. After getting to the back and waiting "for a few seconds" without Defendant appearing, Sullivan stepped back so he "could see over the ladder." Although the shed was "small," Sullivan could not see Defendant; consequently, he walked to the front of the shed. When Sullivan still could not see Defendant, he returned to the ladder and viewed Defendant starting down the ladder. The foregoing caused Sullivan to wonder what Defendant was doing because it was a small roof, yet Sullivan had to walk around to look for Defendant. He also noted there were no tools on the roof.

After Defendant was on the ground, Sullivan told him about the informant and asked permission to search his house. Defendant consented to the search. Penrod then entered the house while Sullivan stayed outside with Defendant and Graviett. When Penrod returned in "barely" over a minute, he indicated to Sullivan he found methamphetamine in the cabinet location described by the informant. The deputies then arrested Graviett and Defendant, called for a transport deputy, and began a more thorough search of the house.

Sullivan started the search in a "utility room" located between the bathroom and the back wall of a bedroom. There, he found a "duffel bag" in the middle of the floor. Knowing methamphetamine labs are often mobile and components thereof are often transported in this manner, Sulli-

van promptly opened the bag. Inside, he found a pint of Liquid Fire, two large spoons, a spatula, Aqua airline tubing, rubber gloves, side cutters, vice grips, plastic bags, coffee filters, plastic spoons, a hot plate, salt (contained in a plastic bag), and two Energizer lithium batteries. The two batteries were in a package designed to hold four batteries.

After seizing the duffel bag and its contents, Sullivan recalled Defendant's delay in descending the shed roof. Accordingly, he went to the roof where he found a "spot of white powder that was smashed in the shingles." He collected a sample of that powder, and a subsequent analysis thereof revealed it was methamphetamine.

Meanwhile, Penrod finished searching the kitchen area. In doing so, he found empty plastic bags in a trash can located in the kitchen. These empty bags contained a residue, i.e., "a real fine powder that they weren't able to scrape out when they were cleaning the bag out." This powder residue tested positive for methamphetamine.

The medicine cabinet, in the only bathroom in Defendant's home, contained two syringes. Penrod testified this fact was of "particular interest" because (1) some methamphetamine users inject the drug with this type of syringe, and (2) he found nothing in the bathroom to indicate a "medicinal purpose for the syringes," i.e., he found no "insulin or anything as such."

At trial, Sullivan testified that each item in the duffel bag was commonly used by persons who manufacture methamphetamine using the anhydrous ammonia method and explained in detail the function of each. Moreover, he testified that based on what he found in the bag and the fact that methamphetamine was in the house, it was his opinion that a substantial step had been taken toward the manufacture of methamphetamine. Penrod testified the "white" color of the methamphetamine found at Defendant's house indicated it came from a "newer" batch, i.e., chemical evaporation will cause methamphetamine to darken over time.

Both Defendant and Graviett were charged with violations of controlled substance laws and both were represented by public defender Christopher Davis (Davis). By the time of Defendant's trial, Graviett had pleaded guilty to "manufacturing methamphetamine." Called as a witness for Defendant, Graviett testified that on April 13 he was staying at Defendant's house; Defendant was gone for two or three days staying with his girlfriend; the duffel bag was brought to Defendant's house by Brian Simpson and left there without Defendant's knowledge; Defendant just returned from his girlfriend's home and had not been inside his house by the time the police arrived; Defendant knew nothing about the duffel bag or its contents; and the methamphetamine found in the kitchen and on the shed roof belonged to him (Graviett).

The jury convicted Defendant on all charges, and this appeal followed. Additional facts will be given as required to analyze Defendant's points relied on.

## DISCUSSION AND DECISION

*Point I: Unpreserved Conflict Of Interest Claim*

In his first point, Defendant alleges the trial court plainly erred when it failed to, *sua sponte,* declare a mistrial when defense witness Graviett testified. Defendant claims "an actual conflict of interest had developed at that point because counsel [Davis] represented both [Defendant and Graviett] when their interests became directly adverse." The factual context for this argument is as follows.

Graviett's claim at Defendant's trial that Defendant knew nothing about the duffel

bag was apparently a surprise to the prosecutor. Specifically, Graviett had not told law enforcement officials the "Brian Simpson" story, i.e., that Simpson allegedly left the bag at Defendant's home without Defendant's knowledge. Moreover, Graviett apparently made no such claim at his guilty plea hearing. Accordingly, the prosecutor's cross-examination tactic was to implicitly accuse Graviett of recent fabrication of this story. Moreover, during cross-examination, Graviett recanted his direct examination testimony that he knew what was inside the bag by saying he had "no clue what was inside of it" and only pleaded guilty to a charge relating to the bag's contents to get out of jail. On redirect, Davis sought to rehabilitate Graviett on this point by using a letter Graviett had written to Davis months before Graviett's guilty plea hearing. In the letter, Graviett accepted blame for all the events occurring at Defendant's house and exonerated Defendant from any involvement or knowledge thereof. Before Graviett could fully identify the letter, however, the State objected and claimed the letter had not been disclosed in response to discovery requests.[2] The court sustained that objection. At that point, Defendant proceeded with the trial without offering the letter into evidence, or making an offer of proof regarding the same, or seeking a mistrial based on defense counsel's alleged conflict of interest.

Defendant argues that if Davis had not represented both Graviett and him, the court would have allowed admission of the letter. As such, Defendant claims the letter would have been a prior, consistent statement attributable to Graviett which would have bolstered Graviett's credibility

with the jury. He insists that the court committed plain error when it did not *sua sponte* declare a mistrial after he was unable to rehabilitate Graviett due to circumstances arising out of defense counsel's "conflict of interest."

■ For Defendant to prevail on his claim of plain error he must show that the court's failure to *sua sponte* grant a mistrial so substantially affected his rights that a manifest injustice or miscarriage of justice will inexorably result if left uncorrected. *State v. Ballard,* 6 S.W.3d 210, 214 (Mo. App.1999); *State v. Weeks,* 982 S.W.2d 825, 837[12] (Mo.App.1998). In applying this standard, we are mindful that a mistrial is a drastic remedy that should be used sparingly and granted only in extraordinary circumstances. *State v. Clover,* 924 S.W.2d 853, 856[5] (Mo.banc 1996); *State v. Mitchell,* 41 S.W.3d 574, 580[4] (Mo.App. 2001). Moreover, appellate courts are especially wary of claims that a trial court erred in failing to grant a mistrial *sua sponte* in criminal cases. *State v. Derrick,* 965 S.W.2d 418, 419–20 n. 1 (Mo.App.1998). This follows because generally the double jeopardy clause of the Fifth Amendment to the United States Constitution bars retrial if a judge grants a mistrial in a criminal case without the defendant's request or consent. *State v. Tolliver,* 839 S.W.2d 296, 299[9] (Mo.banc 1992).

■ To convict a trial court of an error, not put forth by the defendant (e.g., failure to declare a mistrial *sua sponte*), allows an accused to stand mute when incidents unfavorable to him or her occur during trial, gamble on the verdict, and then seek favorable results on appeal. *Weeks,* 982 S.W.2d at 838–39 n. 13. This puts courts in an untenable position, and it is contrary

---

2.  It is reasonably inferable that Davis did not disclose the letter because at Graviett's guilty plea hearing he made essentially the same claims as he made in the letter, i.e., that he knew what was inside the duffel bag and

knew the intended purpose for its contents. Consequently, Davis would have had no idea Graviett would "backtrack" on cross-examination, thus making the letter relevant.

to the principle of law that an appellate court will not convict a trial court of an error not put before it to decide. *Id.*

▪ Here, there was no error, plain or otherwise, resulting from the court's failure to declare a mistrial based upon an alleged conflict-of-interest claim. First, we are not persuaded any such conflict existed.[3] This follows because Davis negotiated a plea agreement wherein Graviett admitted possessing the subject items with the intent to manufacture methamphetamine. Graviett's letter to Davis was consistent with what Graviett later admitted when he pleaded guilty. Consequently, Davis could not have reasonably foreseen, as he prepared for Defendant's trial, that the letter would become relevant.

▪ Second, even if the letter had been disclosed in response to the prosecutor's discovery request, the trial court could have properly ruled it inadmissible as it was merely cumulative of Graviett's testimony. Graviett testified Defendant had no knowledge of the bag or its contents being in Defendant's home. He accepted responsibility for such at Defendant's trial. Moreover, Graviett's testimony was that he gave Davis this information before he pleaded guilty, i.e., "the first time I met you."[4] From this, the jury would obvious-

ly have known that such a statement, if made to Davis, was not a recent fabrication of Graviett's claim of sole responsibility. Consequently, the "first time they met" testimony was as "rehabilitative" as the letter would have been. A court does not plainly err, when for any reason, it excludes merely cumulative evidence. *State v. Nicklasson,* 967 S.W.2d 596, 619[74] (Mo.banc 1998); *State v. Cote,* 60 S.W.3d 700, 706[6] (Mo.App.2001). This is especially so, when as here, any *sua sponte* mistrial consideration would have put the trial court in an untenable position. *Weeks,* 982 S.W.2d at 838–39 n. 13.

On this record, we find no manifest injustice or miscarriage of justice resulted from the exclusion of Graviett's letter. Point denied.

*Point III: Sufficiency of Evidence: Count III Conviction*[5]

▪ Defendant's third point maintains there was insufficient evidence to convict him of possessing precursor ingredients for methamphetamine as proscribed by § 195.420.[6] Specifically, he contends that the State did not prove beyond a reasonable doubt that Defendant possessed the subject chemicals because it failed to establish Defendant knew the chemicals were present, or that he had any control over them.[7] We disagree.

3. To the extent Defendant's Point I argument charges ineffective assistance of counsel and cites cases dealing with ineffective assistance claims, it is not cognizable in this direct appeal, but must be asserted via post-conviction motion. *State v. Motley,* 56 S.W.3d 482, 484[4] n. 1 (Mo.App.2001); *State v. Finster,* 985 S.W.2d 881, 890[14] (Mo.App.1999).

4. Although the "first time I met you" testimony was objected to by the State and the objection was sustained, the objection and ruling came after Graviett had given his answer. The State did not ask the court to strike the answer or instruct the jury to disregard it, and the court did not do so *sua sponte;* consequently, this evidence was still available for

the jury to consider. *See State v. Hirt,* 16 S.W.3d 628, 634[15] (Mo.App.2000).

5. We discuss Point III out of order solely for the sake of convenience.

6. In pertinent part, § 195.420 provides: "It is unlawful for any person to possess chemicals listed in subsection 2 of section 195.400 ... with the intent to ... convert ... that chemical to create a controlled substance ... in violation of sections 195.005 to 195.425."

7. In Count III, the State charged Defendant with possessing "chemicals proven to be precursor ingredients of methamphetamine with the intent to manufacture a controlled substance ... in that ... the defendant possessed

■ "The Supreme Court of Missouri has used the same standards of actual or constructive possession in manufacturing cases as used in possession cases." *State v. Todd*, 70 S.W.3d 509, 521 (Mo.App. 2002). Thus, if actual possession of the drug components and production apparatus is not proven in a manufacturing case, constructive possession thereof will satisfy the state's burden if other facts exist that buttress the inference of the defendant's requisite mental state. *Withrow*, 8 S.W.3d at 80[10].

> "Constructive possession requires, at a minimum, evidence that the defendant had access to and control over the premises where the materials were found.... When the accused shares control over the premises, as here, further evidence is needed to connect him to the manufacturing process. The mere fact that a defendant is present on the premises where the manufacturing process is occurring does not by itself make a submissible case. Moreover, proximity to the contraband alone fails to prove ownership. There must be some incriminating evidence implying that the defendant knew of the presence of the manufacturing process, and that the materials or manufacturing process were under his control." (Citations omitted.)

*Id.* at 80[11, 13–15] Whether sufficient additional incriminating circumstances have been proven is determined by looking at the totality of the circumstances. *State v. Purlee*, 839 S.W.2d 584, 589 (Mo.banc 1992).

Incriminating factors here include the following: The house, where the duffel bag was found, was Defendant's place of residence, and Defendant was at home when the officers arrived. Although Graviett testified he was "living with [Defendant] at that moment[,]" he signed an arrest report

that listed Oran, Missouri (his parents address), as his place of residence. Regardless of where Graviett lived, the jury could have inferred Defendant was the principal occupant of this house, and as such, he had routine access to the kitchen, utility room, and bathroom. Defendant's routine access to the utility room (duffel bag location), kitchen (methamphetamine in two locations), and bathroom (syringes in medicine cabinet) is an incriminating fact not destroyed because Graviett may have had access to those areas. *See State v. Smith*, 850 S.W.2d 934, 944 (Mo.App.1993). The permissible inference that Defendant had routine access to these rooms, and the equally reasonable inference that the incriminating items were either in open view (discarded plastic bags with residue in trash can) or in unsecured locations (methamphetamine in unlocked cabinet), is evidence that tends to connect Defendant with the precursor chemicals in the duffel bag, even if the house was jointly occupied at the time. *See State v. Buford*, 907 S.W.2d 316, 318 (Mo.App.1995); *State v. Steward*, 844 S.W.2d 31, 34 (Mo.App.1992). *See also State v. Camerer*, 29 S.W.3d 422, 426 (Mo.App.2000) (holding presence of syringe of type used to inject illicit drugs on pickup floorboard, although not a compelling circumstance, was a factor jury could consider in deciding if appellant was aware of precursor chemicals in backpack tossed from truck).

Moreover, Defendant's actual possession of newly processed methamphetamine showed his familiarity with this controlled substance and further supported the inference that Defendant knew the duffel bag contained chemicals and paraphernalia used to manufacture methamphetamine. *See State v. Camden*, 837 S.W.2d 520, 522 (Mo.App.1992). This circumstance was especially compelling given that metham-

---

liquid fire, salt, lithium, and various lab para-

phernalia."

phetamine of similar appearance was found in an unsecured cabinet in the kitchen and as residue in empty bags discarded in a kitchen trash can. In saying Defendant was in "actual possession" of methamphetamine, we acknowledge he did not have it on his person. The jury could have found, however, he had that substance within his *easy reach and convenient control,* which is actual possession.[8] § 195.010(33); *State v. Agee,* 37 S.W.3d 834, 836[6] (Mo.App. 2001).

It was wholly logical and reasonable for the jury to infer that the Defendant knew the precursor chemicals were present in his utility room as charged, and that he had control over them based upon the following established or reasonably inferable facts: (1) Defendant was on his premises in actual possession of freshly-made methamphetamine; (2) methamphetamine, appearing similar to that possessed by Defendant, was found at two unsecured locations in the kitchen (to which Defendant had routine access); (3) the bathroom medicine cabinet contained syringes often used to inject illicit methamphetamine (with evidence that the occupants had no lawful need for such syringes); (4) the duffel bag was in open view in the utility room; and (5) Defendant had routine access to the described areas of his house. Based on the totality of the circumstances, we conclude the State made a submissible case against Defendant on the charge of possession of precursors.

In so stating, we have not ignored Graviett's testimony that Defendant had not been home for two or three days prior to April 13, 2001; he arrived home approxi-

mately twenty minutes before the officers arrived; he ascended the shed roof without going inside his house; and the methamphetamine on the shed roof was his (Graviett's), which had apparently fallen from his shirt pocket. Whether he was telling the truth regarding any of the foregoing was for the jury to decide. *Smith,* 850 S.W.2d at 944. Here, as in any other case, the jurors were entitled to use their common sense. *Id.* Considering the totality of the evidence, it would be extremely naive to take the defense testimony at face value. Point III is denied.

*Point II: Sufficiency Of Evidence: Count I Conviction*

■ Defendant's second point claims there is insufficient evidence to convict him of attempting to manufacture methamphetamine. He argues the State did not prove beyond a reasonable doubt that Defendant had taken a substantial step toward manufacturing methamphetamine by processing and preparing chemicals and lab paraphernalia.

With exceptions not implicated here, § 195.211.1 makes it unlawful "for any person to ... attempt to ... manufacture or produce a controlled substance." An "attempt to commit an offense ... [means] a substantial step toward the commission of the offense." § 564.011.1; *Withrow,* 8 S.W.3d at 80. "A 'substantial step' is conduct which is strongly corroborative of the firmness of the actor's purpose to complete the commission of the offense." § 564.011.1.

---

**8.** Evidence that Defendant was on a small shed roof when officers arrived, he moved furtively when told to come down, he tried briefly to avoid being seen by Sullivan, and as soon as Sullivan got on the roof he saw the methamphetamine "right there in the open," supports a finding that Defendant had methamphetamine within his easy reach and con-

venient control while on the roof. That the shed roof was small and the methamphetamine found would have been in easy reach and convenient control of Defendant is confirmed by photographic exhibits. Apparently, Defendant concedes as much since he did not appeal his conviction for possession of methamphetamine.

The State's theory regarding Count I is that Defendant (1) had possession of the utility room at his house, (2) had possession of the duffel bag in that room, (3) knew what was in the duffel bag and had control over its contents, and (4) the contents of the bag were "strongly corroborative of the firmness of [Defendant's] purpose to complete the commission of the offense[ ]" of unlawful manufacture of methamphetamine. Under the State's theory, if Defendant had either actual or constructive possession of the bag and its contents, then testimony from Sullivan and Penrod about how these items were routinely used in the illicit manufacture of methamphetamine was sufficient to convict Defendant of an attempt to manufacture methamphetamine. We agree.

In ruling Point III adversely to Defendant, we held sufficient evidence existed to find Defendant in constructive possession of the duffel bag and its contents. As to the duffel bag contents, Sullivan testified that everything contained therein was routinely used by persons who make methamphetamine by the "anhydrous" method. He explained as follows: (1) powder from crushed or ground-up ephedrine or pseudoephedrine pills are soaked in *Liquid Heat;* (2) the pill product thus dissolved is filtered through *coffee filters;* (3) the soluble form of pure ephedrine realized is evaporated (a process ordinarily accelerated by heating the soluble over an *electric skillet* or *hot plate*); (4) the solid, pure ephedrine produced is put in a bowl and two materials are added and stirred (anhydrous ammonia and lithium strips peeled from *lithium batteries);* (5) the *lithium batteries* are routinely dismantled by using *vice grips* and *side cutters;* (6) the compound realized from mixing the lithium, ephedrine, and anhydrous ammonia is placed in a soda bottle and treated with ether, then *plastic tubing* is inserted through the soda bottle lid; and (7) a mixture of *Liquid Fire* and *salt* is then added, which generates hydrochloric gas under pressure and culminates in the creation of methamphetamine.

Sullivan also testified to the following: Large *spoons* are required to stir the various mixtures to avoid chemical burns. *Rubber gloves,* such as those found in the duffel bag, are needed for the same reason. Other than the *electric skillet,* there were no "other items of normal cooking or food preparation" in the bag, nor were any coffee grounds found therein. The salt in the duffel bag was not in a normal salt container; it was in a plastic bag. *Plastic bags* are customarily used by meth makers to transport salt to avoid leaking as they carry it about.

Photographs of both the *plastic bags* in the duffel bag and those with methamphetamine residue found in the kitchen trash container were put in evidence. Also, photographs were admitted of a spatula found with the methamphetamine in the kitchen cabinet and the one found in the duffel bag. Deputy Penrod testified *spatulas* such as these are used to stir methamphetamine and "cut it into lines."

Sullivan testified that in recent times methamphetamine makers avoid keeping anhydrous ammonia around before or after actual manufacture for fear a leak might occur and the resultant odor will draw unwanted attention. He also noted that methamphetamine making is now frequently done in stages, and once a stage is completed, some chemicals are wholly consumed or the maker gets rid of what is not needed.

Although the items found in the duffel bag had valid uses and were legal to possess, we are persuaded that a sufficient basis was proven by the State for concluding that Defendant took a substantial step toward the manufacture of methamphetamine. This is found in the following: Defendant's possession of the duffel bag

and its contents, when coupled with evidence that Defendant had actual possession of a fresh batch of methamphetamine; similar appearing methamphetamine was in Defendant's house; the otherwise unrelated items in the duffel bag were routinely used in the manufacture of methamphetamine; and the bag contained essentially everything needed to manufacture methamphetamine (except items that could be consumed during the manufacturing process such as pills, anhydrous ammonia, and ether). We find the evidence sufficient to support Defendant's conviction on Count II.

■■■ In so deciding, we do not ignore Defendant's observation that the jury instruction required it to find Defendant attempted to make methamphetamine "by *processing and preparing* chemicals and lab paraphernalia." (Emphasis supplied.) In structuring his argument, Defendant seems to imply—but never develops such argument—that even if it was proven he knowingly possessed the bag's content and his possession was a substantial step toward manufacture, his conviction should be reversed because there was no evidence he "processed and prepared" the items in the bag. Because he cites no authority for such an argument and never develops it, we consider it abandoned.[9] *See Mitchell,* 41 S.W.3d at 577[1]; *State v. Puig,* 37 S.W.3d 373, 375[6] (Mo.App.2001). Point II is denied.

*Point IV: Unpreserved Claim Of Double Jeopardy*

■■■ Defendant's fourth point relied on attempts to raise a double jeopardy claim. He contends the trial court "plainly erred"

when it sentenced him for the Count III offense of possessing precursor ingredients of methamphetamine with the intent to manufacture a controlled substance; that Defendant could not be convicted of both Count I (attempting to manufacture methamphetamine by compounding, processing and preparing chemicals and lab paraphernalia for the purpose of manufacturing methamphetamine) and Count III (possessing chemicals proven to be precursor ingredients of methamphetamine with the intent to manufacture a controlled substance), because Defendant could not process, prepare, and collect chemicals without also possessing them. With his point relied on thus structured, Defendant argues that possessing precursor ingredients is a lesser-included offense of attempting to manufacture methamphetamine.

In his brief, Defendant concedes he did not assert the double jeopardy claim he states in Point IV at the trial level. We addressed this circumstance in *State v. Gaver,* 944 S.W.2d 273 (Mo.App.1997), holding:

> " '[I]t is well-settled that double jeopardy is a personal right which, if not properly raised is waived. *State v. Miner,* 748 S.W.2d 692, 693 (Mo.App. E.D.1988). As appellant was remiss in raising his double jeopardy claim at trial and in post-trial motions, we find appellant has waived this right.' "

*Id.* at 279[7], *quoting State v. Baker,* 850 S.W.2d 944, 947 (Mo.App.1993). *See State v. Markham,* 63 S.W.3d 701, 708[11] (Mo. App.2002) (quoting and following *Gaver* ). *See also Rost v. State,* 921 S.W.2d 629, 635–36 (Mo.App.1996), and *Horsey v.*

---

9. In passing, we note that the words "process" and "prepare" are not statutorily defined terms. The dictionary definition of prepare is, *inter alia,* to "procure as suitable or necessary." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1976) at 1790. Based on evidence recounted from this record, the jury could have reasonably inferred Defendant "procured" the things in the bag as "suitable or necessary items" in his attempt to manufacture methamphetamine.

*State,* 747 S.W.2d 748, 754–56 (Mo.App. 1988), for detailed discussions and analyses of this issue. Point IV is denied.

*Point V: Exclusion Of Graviett's Letter From Evidence*

Defendant's fifth point maintains the trial court committed reversible error when it ruled Defendant could not put Graviett's letter in evidence. Defendant requests we review this point under the plain error standard of Rule 30.20 in an apparent recognition that this claim of trial court error was unpreserved because he failed to show the materiality and relevance of the letter by way of an offer of proof. *See State v. Hemby,* 63 S.W.3d 265, 268[4] (Mo.App.2001).

We explained under Point I that everything in the letter was put before the jury via Graviett's testimony, as was the fact that Graviett told Davis "the first time [they] met" of his involvement and Defendant's non-involvement in this crime; consequently, the letter was merely cumulative evidence. Again, a court does not plainly err, when for any reason, it excludes merely cumulative evidence. *Nicklasson,* 967 S.W.2d at 619[74]; *Cote,* 60 S.W.3d at 706[6]. Point V is denied.

The judgment of conviction and sentence are affirmed.

PARRISH, J., concurs.

RAHMEYER, C.J., concurs.