STATE of Missouri, Plaintiff–Respondent,

v.

James Earl HITCHCOCK, Defendant–Appellant.

No. SD 30062.

Missouri Court of Appeals, Southern District, Division One.

Jan. 12, 2011.

Craig A. Johnston, Columbia, MO, for Appellant.

Chris Koster, Attorney General, and, Terrence M. Messonnier, Assistant Attorney General, Jefferson City, MO, for Respondent.

DON E. BURRELL, Judge.

A jury found James E. Hitchcock ("Defendant") guilty of second degree murder and armed criminal action for killing Wendell Hillhouse ("Victim") with a rifle and a baseball bat. *See* sections 565.021 and 571.015.[1] After denying Defendant's motion for new trial, the trial court sentenced Defendant as a prior offender to twenty-five years on the murder charge and ten years on the armed criminal action count.[2] Defendant now appeals his convictions, claiming the trial court erred by allowing the State to introduce improper "other

---

1. Unless otherwise indicated, all statutory references are to RSMo 2000.

2. Because the trial court did not specify whether the sentences were to run concurrently or consecutively, they are presumed to run concurrently under section 558.026.1. *See also State ex. rel Zinna v. Steele*, 301

S.W.3d 510, 515 (Mo. banc 2010) (Rule 29.09 embodies the policy of section 558.026.1 so that sentences run concurrent if a consecutive sentence is not orally pronounced by the trial court). Unless otherwise noted, all rule references are to Missouri Court Rules (2010).

crimes and bad acts evidence" and refusing to allow defendant's expert witness to opine that Victim could not have been shot in the manner described by Defendant's ex-wife. Finding no such error, we affirm.

### Facts

Viewed in the light most favorable to the verdict, *State v. Ondo*, 232 S.W.3d 622, 624 (Mo.App. S.D.2007), the facts are as follows. Defendant was married to June Hitchcock ("June") until they divorced in 1996.[3] Defendant and June lived in a residence located on 120 acres owned by June's parents ("the Smiths"). Defendant also operated a salvage business on the Smiths' property. Defendant and June reconciled two years after their divorce and lived together from 1998 until 2007, when Defendant entered into a romantic relationship with Tammy Bartlett ("Bartlett").

June moved out of the house when Defendant began seeing Bartlett, and she eventually moved into a trailer home located on another portion of her parents' 120 acres. In July 2008, Bartlett moved in with Defendant. Soon after, June's father, Carl Smith, "[had] eviction papers served on [Defendant]." Defendant and Bartlett left the home and moved to a residence in Tecumseh.

Around August 2008, June began a romantic relationship with Victim and planned to marry him. Victim started moving his belongings into June's trailer home the same week Defendant was removing the rest of his belongings from the Smiths' land. On the morning of August 15, 2008, while cleaning out a garage at his salvage yard, Defendant discovered that June had removed several replacement parts for a vehicle Defendant had purchased from her. Defendant was angry

about the missing parts and called June. After Defendant calmed down, June agreed that she and Victim would help Defendant move several vehicles from the Smiths' property to Defendant's Tecumseh residence.

When June and Victim arrived at the salvage yard, Defendant directed each of them to drive a vehicle and follow him to the Tecumseh residence using Monastery Road, a gravel road in a secluded section of Douglas County. As the trio proceeded along Monastery Road, Defendant was apparently having car trouble and pulled the Kia he was driving over to the side of the road. By the time June reached Defendant's vehicle, Victim and Defendant were looking at the small SUV's engine, which was steaming. June asked Defendant what was wrong with the vehicle. Instead of answering her, Defendant opened the driver's door of the Kia, pulled out a rifle, and shot Victim two times in rapid succession. When June began screaming, Defendant told her that she was going to die. Defendant retrieved another gun from the vehicle and managed to carry both guns with him while he dragged Victim by his feet toward some nearby woods. As Defendant dragged Victim into the woods, he told June not to run away.

After Defendant went into the woods, June attempted to flee, but she was apprehended by Defendant. Defendant then took June's purse, which contained her cell phone and a Derringer pistol and ammunition. Defendant loaded the Derringer and kept it. He broke June's phone into pieces and threw them across the road in the opposite direction from where he had taken Victim's body. Defendant escorted June at gunpoint to the Kia. He then went back into the woods, carrying a baseball

---

**3.** As Ms. Hitchcock has the same last name as Defendant, she will be referred to by her first name for purposes of clarity. No disrespect or familiarity is intended.

bat. After returning from the woods, Defendant told June that he had hit Victim two times with the bat to make sure he was dead.

Defendant took June back to the salvage yard and told her that they would "spend some time in the woods and [she] had to watch [her] parents die." Over the course of that afternoon and into the early morning hours of the next day, Defendant took June from the scene of the crime to the salvage yard, to June's trailer, into the woods between June's trailer and her parents' residence, to the Tecumseh residence, back to the scene of the crime, back to the salvage yard, and, finally, back to June's trailer home, where they both fell asleep. While June and Defendant were at the Tecumseh residence, Defendant put a package of hotdogs in front of June and told her to eat her last meal.

The following morning, Defendant ordered June to go to the store and get him "a Pepsi and cigarettes." Before she left, June promised not to tell anyone what had happened. Instead of taking the opportunity to flee, June bought the items and returned. She said she did so because she feared for her daughter and grandchild who lived next door. When June returned from the store, Defendant told her to take him to the salvage yard. June again promised to tell no one what had happened. After she dropped Defendant off at the salvage yard, June went to her daughter and son-in-law's home and told them what had happened.

While June was at her daughter's home, Defendant called and ordered her to bring him his cell phone charger, which he had left in June's trailer home. June retrieved the charger and took it to Defendant at the salvage yard. As an excuse to get away, June told Defendant that she needed to go to Ava to replace her cell phone. June again told Defendant that she would

not say anything about what had happened. Fearing that Defendant might follow her, June went to Wal–Mart and purchased a replacement cell phone. June then went to the Douglas County Sheriff's Office, where she reported that she "wanted to turn [herself] in and [her] ex-husband had killed [her] boyfriend." June led investigators to the general area where the killing had occurred, and the officers eventually found Victim's body. Additional facts will be set forth below as we analyze Defendant's points.

## Analysis

### Points I and III: Mr. Smith's Testimony about Defendant's Prior "Bad Acts"

Defendant's first and third points are closely related, and we will address them together.

Point I challenges the trial court's decision to allow Mr. Smith to testify that Defendant "dominated and controlled [June] during their marriage, that June was scared of [Defendant], and that once, while June was driving, [Defendant] grabbed the wheel, forced June's car into a tree, dragged her out by her hair across a ditch and 'worked her over[.]'" Defendant contends Mr. Smith's testimony constituted inadmissible evidence of prior bad acts and bad character that was solicited to "divert the jury's attention and was designed to inflame the passions of the jury."

Point III contends the trial court: 1) plainly erred by allowing Mr. Smith to testify that Defendant had "nearly cut off Mr. Smith's grandson's ear with a beer bottle and left [the grandson] lying beside the road[;]" and 2) should have, *sua sponte*, declared a mistrial because the testimony constituted improper bad char-

acter evidence "solely designed to inflame the passions of the jury."

■ Defendant concedes that we may review the testimony about Defendant's assault of Mr. Smith's grandson only for plain error as defense counsel did not object to the evidence at trial. Defendant did object at trial to the introduction of the evidence referenced in Defendant's first point, leading him to ask us to review that ruling for an abuse of discretion. But Defendant's trial objection was different from the claim he now asserts on appeal. When the prosecutor asked Mr. Smith at trial whether Defendant had been "abusive towards June[,]" the following exchange took place:

> [Defense counsel]: Objection, approach the bench, Your Honor.
>
> {BENCH CONFERENCE OUT OF JURY HEARING}
>
> [Defense counsel]: Judge, I know the State's going to try to get into this with [June], I'm going to have a lengthy objection to that point, too, because of remoteness and time has [sic] nothing to do with this case. He can't testify about it. Everything he knows he's been told.
>
> [Prosecutor]: Judge, He's testifying they've lived on his property right next door to him.
>
> [Defense counsel]: I think it's all prejudicial and . . .
>
> THE COURT: What is the relevance of the abuse?
>
> [Prosecutor]: Why June didn't go to the cops immediately. This man has been extremely abusive all these years they've been together since 1980.
>
> THE COURT: He can't make conclusions like abuse.
>
> [Defense counsel]: Did you say he can he [sic] go back to 1980, Judge?
>
> THE COURT: I didn't say that.

> [Defense counsel]: It's over my objection.
>
> THE COURT: Go ahead.
>
> CONTINUING, BY [Prosecutor]:
>
> [Prosecutor]: And what you were able to see, Mr. Smith, was June dominated and controlled by [Defendant]?
>
> [Mr. Smith]: Yeah.
>
> [Prosecutor]: In your observations in living there next to them for 25 plus years, was June scared of [Defendant]?
>
> [Mr. Smith]: Yeah.

Defendant's complaint at trial was that the testimony concerned matters that were too remote in time and were based on second-hand knowledge. He did not object to the testimony on the ground that it constituted evidence of inadmissible "bad acts." Defendant asserts in his reply brief that his "prejudicial" objection was interrupted by the trial court before it could be completed, and the trial court went on to ask the prosecutor about the relevance of the question, thereby incorporating lack of relevance into Defendant's objection. Defendant also points out that his motion for new trial included an allegation of error concerning the admission of "bad acts" evidence.

Defendant claims that "bad acts" evidence is inadmissible because it is legally irrelevant and more prejudicial than probative, essentially contending that an objection based on relevance or prejudice is the same thing as an objection based on admission of bad acts evidence. We have previously rejected this argument. In *State v. Herrick,* 814 S.W.2d 660, 662–63 (Mo.App. S.D.1991), we found that the defendant's trial objections of "irrelevant" and "irrelevant and more prejudicial than probative" were insufficient to preserve a claim on appeal that the evidence was inadmissible proof of other crimes.

At trial, appellant's lawyer made no contention that the evidence of appellant's behavior toward the [victims] demonstrated other crimes. Consequently, the question whether it did and, if so, whether it came within one or more of the exceptions set forth in *[State v.] Engleman,* 653 S.W.2d [198, 199 (Mo. banc 1983) ], was never presented to the trial court. An appellate court will not convict a trial court of error on an issue which was not put before it to decide. *Id.* at 663. *See also State v. Mayes* 63 S.W.3d 615, 633 (Mo. banc 2001) (claim on appeal that admission of bad acts evidence was error would be accorded plain error review only because objection at trial was based on speculation and relevancy). Thus, we find that Defendant's trial objections were insufficient to preserve his first point for regular appellate review.

Even if it had been properly preserved, Defendant abandoned his original objections and only received what he asked for when the following exchange took place after the prosecutor asked Mr. Smith why he had evicted Defendant, and Mr. Smith responded that Defendant "got physically rough on a family member."

[Defense counsel]: I'm going to object and ask that he be specific, Your Honor, you know, whatever he saw or observed than to just generally talk about it.

THE COURT: Overruled at this stage. Go ahead.

CONTINUING, BY [Prosecutor]:

[Prosecutor]: Okay, go ahead.

THE COURT: Be more specific.

[Prosecutor]: I didn't understand exactly what you said, sir, you said he got physically violent toward some family members?

[Mr. Smith]: Yeah.

[Prosecutor]: How so?

[Mr. Smith]: Well he pulled June's car into a tree, and tore it up, then he drug her out by the hair of the head and drug her across a ditch and worked her over. Then, he had my grandson, they went over to Bryant and he cut his ear nearly off, so he was starting in to ...

[Prosecutor]: Who did that?

[Mr. Smith]: [Defendant].

[Prosecutor]: The man sitting over there?

[Mr. Smith]: That man right there.

[Prosecutor]: Okay.

Defendant did not argue to the trial court that this testimony was inadmissible or should be stricken because it constituted evidence of prior bad acts admitted to prove propensity. Because Defendant has changed his claim of error on appeal, point I is reviewable only for plain error. *See State v. Phillips,* 939 S.W.2d 502, 505 (Mo. App. W.D.1997) ("To preserve a claim of error in the taking of evidence, an accused must object with sufficient specificity to apprise the trial court of the grounds for the objection"); *State v. Goins,* 306 S.W.3d 639, 647 (Mo.App. S.D.2010) (objections did not preserve point on appeal contending that evidence was prior misconduct); *State v. Johnson,* 483 S.W.2d 65, 68 (Mo. banc 1972) ("The ground of objection in this court is limited to that stated at the trial"); *Herrick,* 814 S.W.2d at 662–63; and *Mayes,* 63 S.W.3d at 633.

■ To prevail under plain error review, the "[a]ppellant must demonstrate that the error asserted so substantially affected the rights of the accused that manifest injustice or miscarriage of justice inexorably results if left uncorrected." *Phillips,* 939 S.W.2d at 506.

*The Admission of Mr. Smith's Testimony Regarding Defendant's Abuse of June And Defendant's Assault on Mr. Smith's Grandson Was Not Plain Error*

■ Defendant correctly argues that prior bad acts and bad character evidence

is inadmissible to show that a defendant has a propensity to commit crime. *State v. Davis*, 226 S.W.3d 167, 170 (Mo.App. W.D. 2007) ("A defendant has the right to be tried only on the offense for which he is charged"). Defendant bears the burden of demonstrating that the evidence he challenges constituted inadmissible evidence of prior bad acts. *See State v. Turner*, 242 S.W.3d 770, 778 (Mo.App. S.D.2008) (defendant did not demonstrate with specificity that gang membership was a bad act).

In the case at bar, the prosecutor asked Mr. Smith whether June was scared of, and "dominated and controlled" by Defendant. Mr. Smith simply responded, "Yeah" to each question. As the State correctly points out in its brief, this evidence fell well short of constituting evidence of specific bad acts or misconduct by Defendant.

■ The more detailed testimony about which Defendant complains came in only after defense counsel objected on the ground that the witness's answer—that Defendant "got physically rough on a family member[ ]"—was *not specific*. As a result, Mr. Smith went on to testify more specifically and dramatically that Defendant had assaulted June and his grandson. Defendant made no request for relief in response to this testimony. By requesting that Mr. Smith provide specific examples of Defendant's prior violent acts, Defendant invited the very error about which he now complains. "No criminal trial or judgment should be affected, in any manner, by an error committed at the instance of the defendant." *State v. Williams*, 118 S.W.3d 308, 313 (Mo.App. S.D.2003).

Defendant cites *State v. Watson*, 968 S.W.2d 249 (Mo.App. S.D.1998); *State v. Milligan*, 654 S.W.2d 204 (Mo.App. W.D. 1983); *State v. Taylor*, 739 S.W.2d 220 (Mo.App. S.D.1987); and *State v. Spivey*, 710 S.W.2d 295 (Mo.App. E.D.1986) as cases reversed on the grounds that "bad acts" evidence had been improperly received.

■ *Watson*, *Milligan*, and *Spivey* are readily distinguishable because they did not involve error invited by the defendant. 968 S.W.2d at 253–54, 654 S.W.2d at 208–09, and 710 S.W.2d at 299–301. In *Taylor*, the defendant referred to the objectionable evidence in opening statement[4] and in his cross-examination of the victim. 739 S.W.2d at 223. On review, the court noted that, generally, when "a defendant presents the same evidence to which he objected when offered by the state, any

4. The *Taylor* Court also found that "[t]he state's argument that defendant's mention of the assault in opening statement resulted in a waiver of any complaint about the evidence of the unrelated crime is without merit. An opening statement does not constitute evidence." *Id.* After *Taylor*, the Missouri Supreme Court stated that "a defendant's opening statement can open the door to evidence of a prior crime." *State v. Rutter*, 93 S.W.3d 714, 727 (Mo. banc 2002). "When evidence is inadmissible because it is not relevant, it can nevertheless become admissible because a party has opened the door to it with a theory presented in an opening statement." *Id.* Thus, a theory presented in defendant's opening can cause otherwise irrelevant evidence to become relevant and admissible. *Id.*

"When a defendant injects an issue into a case, the state may offer[ ] otherwise inadmissible evidence in order to explain or counteract a negative inference raised by the issue." *State v. Bolds*, 11 S.W.3d 633, 639 (Mo.App. E.D.1999). As noted above, defense counsel addressed June's delay in reporting the murder in his opening statement. We are not inclined to find that Defendant opened the door by his initial statement because the prosecutor had already stated in his opening that June "was abused, she [sic] dominated by him, she was controlled. When they divorced in 1996 it was so bad she had to move to Arkansas to get away from the guy." However, Defendant voiced no objection when the State made the references in its opening statement.

claim of prejudice by presentation of the otherwise inadmissible evidence of another crime is waived." *Id.* The general rule was not applied in *Taylor* because the defendant did not offer "evidence to the same effect as the challenged evidence." *Id.* The other crimes evidence in *Taylor* also lacked a logical nexus with the charged crime and did not corroborate evidence which itself was relevant to the issue of the defendant's guilt. *Id.*

*Taylor* is distinguishable from the instant case. Here, Defendant went further than the prosecution in eliciting detail about Defendant's assaults on June and Mr. Smith's grandson. And there was a logical connection between the assaults and June's failure to immediately report Victim's murder to the police because of her fear of Defendant. By eliciting the details of the evidence himself, Defendant waived any complaint he might have had.

■ Finally, "[a]ppellate courts are wary of claims that a trial court erred in failing to declare a mistrial *sua sponte* in a criminal case." *State v. Derrick,* 965 S.W.2d 418, 419 n. 1 (Mo.App. S.D.1998). "To convict a trial court of an error, not put forth by the defendant (e.g., failure to declare a mistrial *sua sponte* ), allows an accused to stand mute when incidents unfavorable to him or her occur during trial, gamble on the verdict, and then seek favorable results on appeal." *State v. Tilley,* 104 S.W.3d 814, 819 (Mo.App. S.D.2003). Such a strategy places the trial court "in an untenable position, and it is contrary to the principle of law that an appellate court will not convict a trial court of an error not put before it to decide." *Id.* at 819–20. It would be particularly inappropriate for this court to rule that a trial court plainly erred by failing to declare a mistrial, *sua sponte,* when the defendant himself elicited the testimony at issue and made no attempt thereafter to have it excluded. No

miscarriage of justice or manifest injustice appears. Defendant's first and third points are denied.

### Point II: Testimony by June of Defendant's Prior "Bad Acts"

■ Defendant's second point contends the trial court erred in admitting June's testimony that Defendant was abusive, that he stalked her, and that she was afraid of Defendant because it constituted other bad acts evidence that was more prejudicial than probative, that Defendant's character was not at issue, and that the testimony was designed to inflame the passions of the jury. The State concedes in its brief that Defendant preserved this point for appellate review. In light of this concession, we will consider whether the trial court abused its discretion in receiving the testimony.

■ "A trial court has broad discretion to admit or exclude evidence at trial." *State v. Madorie,* 156 S.W.3d 351, 355 (Mo. banc 2005). We will reverse a trial court's ruling on the admission of evidence only if it clearly abused its discretion. *Id.* An abuse of discretion occurs "when a ruling is clearly against the logic of the circumstances and is so unreasonable as to indicate a lack of careful consideration." *State v. Gonzales,* 153 S.W.3d 311, 312 (Mo. banc 2005). Further, the trial court action is reviewed for prejudice caused by the error; thus, we will reverse only if the error was so prejudicial that it denied the defendant a fair trial. *State v. Middleton,* 995 S.W.2d 443, 452 (Mo. banc 1999). "Trial court error is not prejudicial unless there is a reasonable probability that the trial court's error affected the outcome of the trial." *State v. Forrest,* 183 S.W.3d 218, 224 (Mo. banc 2006).

As Defendant acknowledges, evidence of prior misconduct may be admissible if it is both logically relevant (has some legitimate tendency to directly establish the defendant's guilt of the offense charged) and legally relevant (its probative value outweighs its prejudicial effect). Well-established exceptions to the inadmissibility of prior misconduct include use of the evidence to prove: "(1) motive, (2) intent, (3) absence of mistake or accident, (4) a common scheme or plan, or (5) the identity of the person charged." *State v. Blakey*, 203 S.W.3d 806, 812 (Mo.App. S.D. 2006). But "[e]vidence of prior misconduct that does not fit any of the articulated exceptions may still be admissible if it is logically and legally relevant." *Id.*

June testified that during the course of her marriage to Defendant, Defendant displayed a temper, put guns to her head, pulled her hair, and broke furniture. She also testified that Defendant stalked her before and after the divorce. She testified that when she confronted Defendant about his relationship with Bartlett, Defendant hit her with a wet towel and tried to stab her finger with a knife.

The State concedes that this evidence constituted evidence of other crimes but contends it was not introduced to prove propensity. Instead, the State says it was offered to explain why "the main State's witness in this case" delayed reporting Victim's death for approximately twenty-four hours.[5] The State cites multiple cases holding that prior bad acts are admissible to explain that a witness's fear of the defendant led to a delay in reporting a matter to the police. Of those cited, *Mid-dleton v. State*, 80 S.W.3d 799 (Mo. banc 2002), is most pertinent to this discussion.

In *Middleton*, the defendant was convicted of killing two people. 80 S.W.3d at 803. Middleton alleged his appellate counsel was ineffective by failing to challenge the admission of evidence and subsequent closing argument that a witness did not go to police with his information until he learned that a third person was dead and remembered that the defendant indicated the third person was a "snitch" and should be killed. *Id.* at 808. Defense counsel asked the witness if it was true that he had not immediately gone to the police with his information about the victim. On re-direct, the prosecutor asked the witness why he had waited. *Id.* Defense counsel objected both to the question and the prosecutor's subsequent closing argument reference to the response the witness had given. *Id.* Appellate counsel did not pursue a claim of error based on the admission of other crimes evidence. Appellate counsel was not found ineffective for making that choice because the testimony at issue was admissible in rebuttal to explain why the witness had waited before contacting the police. *Id.* at 808–09.

Here, Defendant did not object to the prosecutor's opening statement reference to Defendant's abuse and domination of June. Instead, Defendant signaled that he would be addressing the matter head-on when he said the following in his opening statement:

> I don't know, her dad, [Carl] Smith, you know, the evidence will be, he only evicted [Defendant] only because June wanted him gone because she's jealous over the new girlfriend, [Bartlett], that

5. *See State v. Coutee*, 879 S.W.2d 762, 768 (Mo.App. S.D.1994) (prior misconduct of defendant admissible, in part, to explain witness' delay in calling police); *but see State v. Pennington*, 24 S.W.3d 185, 191 (Mo.App. W.D.2000) (other crimes evidence not admissible to explain witness' actions in blocking defendant's car). The evidence was especially probative here because Defendant used June's reporting delay to attack her credibility.

he's moved in. Yeah, they were married, and they were divorced, yeah they had some fusses, but, you know, I don't think the evidence is going to be, at least from our side of the case, that she was abused, ever injured. They had two kids together, April and Larry. They just kind of had a normal get together, get untogether [sic] type marriages [sic] that you see around here sometimes, you know, the kids both turned out okay. It wasn't great, it wasn't terrible. I think the evidence is going to show that June is still in love with [Defendant] and was very jealous of him. Now, what's really significant about this case is that, you know, as I said before, June never tells anybody when she can get away from him and I think you're going to find the evidence is going to show you folks, there's lots of opportunity for June [ ] to get away from this vicious man. But she never took advantage of any of that according to what she wants you to believe. Even when he sent her to the store, allegedly, to get cigarettes and sodas that next morning, Saturday morning, around 10:00, 10:30, maybe 11:00. When you come to Squires from where, I don't know if you all know where this is, but it's out by Rockbridge, toward that area, and Souder, the little store down there. When you come all the way from there to town, you're almost half way to Ava, but yet she said she had to turn around and go back. I don't know if she's going to testify that she was afraid her daughter and grandkids would be killed, but if it is, that ain't going to work because they aren't afraid of their dad, they love their dad.

In light of these statements, the evidence Defendant challenges was admissible to explain why June delayed reporting the murder.

Defendant's reply brief asserts June did not claim that the prior bad acts caused her to delay reporting the murder, citing testimony from June that she did not "bolt" when she was driving one of the vehicles in front of Defendant because he "would have caught [her] [;]" and that she returned to her home after going to the store because her son-in-law was working on the power there and she "was worried about [her] daughter and grandbaby because they were right next door." This argument ignores the fact that June also testified that Defendant had caught her before as she had tried to flee in a vehicle. June's fear of Defendant was also relevant to explain why Defendant's close proximity to June's daughter, son-in-law, and grandbaby was worrisome to her.

Defendant also argues that more general testimony from June about past events and her testimony of how the murder took place would have sufficed to explain her fear of Defendant without injecting any details of past abuse. Defendant's characterization in opening statement of the relationship with June as a "normal" one with "some fusses" but no abuse or injury called for a particular description of the abuse and injury involved.

The testimony now challenged by Defendant was logically and legally relevant to respond to Defendant's challenge to June's credibility based on her delay in going to the police. As discussed above, Defendant had also earlier indicated when Mr. Smith was being questioned that he preferred specificity over generalities. The testimony from June was largely similar to and cumulative of the detailed testimony Mr. Smith had presented at Defendant's insistence. Point two fails.

### Point IV: Exclusion of Certain Expert Testimony

■ Defendant's final point claims the trial court erred in sustaining the State's

objection that prevented Defendant from eliciting testimony from Gene Gietzen, a "forensic scientist," that:

[1.] the shooting could not have occurred the way June said it did;

[2.] a person would have to go 4½ feet from the left of the driver's door to arrive at an angle where it would have been possible for a weapon to be discharged striking the victim in the neck and the abdomen, which was contrary to June's statements;

[3.] Gietzen found inconsistencies when comparing June's statements [with] the crime scene evidence; and

[4.] because the abdominal wound had soot and the neck wound did not, Gietzen believed that the shots were 21 from two different distances, which also was contrary to June's statementsand testimony.

▆▆▆ "Questions as to the admissibility of [proffered] expert testimony in a criminal proceeding are within the sound discretion of the trial court." *State v. Bounds*, 716 S.W.2d 458, 460 (Mo.App. E.D.1986). The admissibility of experimental evidence is also within the sound discretion of the trial court. *State v. Roberts*, 873 S.W.2d 638, 642 (Mo.App. W.D. 1994).

Defendant bears the burden of demonstrating that the trial court abused its discretion in refusing to admit such testimony and that Defendant was thereby prejudiced. *See Bounds*, 716 S.W.2d at 460.

Defense counsel made an offer of proof by having Gietzen testify outside the presence of the jury. In that offer, Gietzen testified that his previous experience included working as a police officer, a criminalist, and as the supervisor of the Springfield Regional Crime Lab. In the course of his career, Gietzen worked in the areas of crime scene investigation; blood, drug, and arson analysis; firearms examinations; identification chemistry; and latent prints. Gietzen testified that Bartlett brought Defendant's Kia to a meeting with Gietzen and defense counsel at the murder site. Gietzen relied on defense counsel's determination of the approximate location of the crime as "there were no measurements in the police reports that would pinpoint the location of where [Victim] was found that [they] could use to go back exactly to that scene." Gietzen propped open the hood of the Kia and measured from the top of the hood to the headlight. He also measured the distance from the radiator cap to both the front and rear of the driver's door.

Next, Gietzen attempted a "crime scene reconstruction" that, based upon various angles, tried to determine "whether or not a person standing by the driver's door and outwards from the driver's door could discharge a firearm striking the victim in the neck and in the abdomen." He also considered the fact that there were soot marks on Victim's abdominal wound, but not on his neck wound. Using this information, Gietzen opined that while it would have been possible for the shooter to shoot Victim in both the neck and abdomen while they were standing in one place if the shooter was standing four-and-one-half feet from the driver's door, a shooting from that distance would not have deposited any soot on the body.

Gietzen also testified that he reviewed a police photo that showed a bullet that had been recovered from an area between Victim's back and his T-shirt, along with other photos of a lead bullet with copper jacketing, including one that was out of focus, recovered during the autopsy. He stated that the bullet jacketing was "rolled back."

In Gietzen's opinion, the bullet's condition and the soot on the abdomen indicated that the bullet was fired at close range while Victim was on the ground.

Gietzen testified that he inspected the surface of the ground and considered the pathologist's report of drag marks on the chest and right side of Victim's body. Gietzen opined that the marks on Victim's side were consistent with being dragged by the heels, but horizontal marks on Victim's chest were not consistent with this. He thought there should be signs of dragging on the upper back, and he did not see those in the photographs he had examined.

The offer of proof also included Gietzen's testimony that he observed "Decade" brand cigarettes in police photographs of the crime scene and later in photographs of a Ford Explorer. Deputy Huddleston testified that a Decade brand cigarette pack was found at the crime scene in a ditch on the opposite side of the road. He also testified that a trooper had searched June's Explorer. June testified that Defendant had her drive him to her trailer in her Explorer.

The State characterized Gietzen's crime scene reconstruction as simply an opportunity for him to improperly testify that June was not telling the truth about what had occurred. The trial court ruled that Gietzen could testify to the jury about the measurements he had made and that defense counsel could argue in closing that the shooting could not have happened the way June described it. The prosecution objected to Gietzen testifying that Victim was on his back when he was shot in the abdomen because he was not qualified to give such an opinion and he did not test the bullet or perform scientific experiments to substantiate his opinion. After questioning Gietzen about his qualifications and experience, the trial court permitted both sides to ask additional questions before making the following ruling:

THE COURT: I don't think that he should be able to testify as to what happened here because he doesn't know, but I think you should be able to testify as to what he's observed in other cases that look similar to this. I don't think he can tell from the pictures as to what happened here, but I think he should be entitled to testify as to his experience in wounds like this one. What do you say about that?

[Defense Counsel]: If that's the Court's ruling, I'll accept it.

The foundation for Gietzen's opinion concerning drag marks on Victim's body was challenged by the State on the basis that he could not testify that the ground appeared the same on the date of the murder as when he saw it later. The trial court ruled as follows:

[h]e can testify of the effect of dragging on the body. He did not examine the body, he did not examine himself the area where the body was dragged, so I don't think he could testify about those things. The jury can look at them and they can look at the autopsy results and search their memories and they can remember any damage to the body themselves.

The trial court also ruled that Gietzen could testify, based upon his experience, about how bullets react when shot. The State objected to Gietzen's testimony that he observed Decade brand cigarettes in photos of June's Explorer and from a photo near the scene as cumulative. The trial court ruled that Gietzen could testify about his observation of the cigarettes in the photos.

The State argues that Defendant's offer of proof was insufficient to preserve these matters for our review and that we can

only speculate as to the actual testimony that would have been presented.

■ "An offer of proof must show three things: 1) what the evidence will be; 2) the purpose and object of the evidence; and 3) each fact essential to establishing the admissibility of the evidence." *State v. Tisius*, 92 S.W.3d 751, 767 (Mo. banc 2002). The sufficiency of the offer of proof in this case is not critical because Defendant was actually permitted to offer to the jury most of the evidence he complains was excluded. And the trial court properly excluded the remaining portions of Gietzen's proposed testimony.

■ "Evidence of experiments conducted out of court are admissible, within the discretion of the trial court, 'if it is shown that the experiments were conducted under conditions substantially similar in essential particulars to the conditions prevailing at the time of the occurrence in suit.'" *Roberts*, 873 S.W.2d at 642 (quoting *State v. Starr*, 676 S.W.2d 311, 314 (Mo.App. S.D.1984)). Gietzen was allowed to testify to the jury that he inspected the Kia after it was brought back to the area near the murder and to discuss photographs he had taken of his work. He testified that he made certain measurements, including the distance from the open hood to the radiator cap; the front of the vehicle to the front of the driver's door; and the front of the vehicle to the rear of the driver's door. Gietzen also testified that he "found that outside the door radius, with the door fully opened, would be, four and a half feet would be approximately a little bit beyond that, so the door would open somewhere around four feet[.]" Some of his photographs were admitted as exhibits.

In his testimony to the jury, Gietzen confirmed that he reviewed the autopsy report and photos of Victim's body insofar as they addressed the bullet found in Victim's back. Gietzen testified that his experience with similar appearing bullets was "consistent with the bullet being discharged while the victim laid on a hard surface." He also testified that the bullet "mushroom[ed]" as expected with a hollowpoint bullet. The jury also heard Gietzen testify that he went out to the "general area, in the vicinity of where the body was found." Gietzen testified that he had experience in interpreting drag marks on bodies. He stated that "[i]f a person is drug [sic] by the heels they would have the, the majority of the body weight would be shifted to the shoulder area, upper back, shoulder area, that's where one would expect to find evidence of drag marks." Gietzen also testified that he observed packages of Decade brand cigarettes in police photos taken at the crime scene and in June's Explorer.

Gietzen testified that the soot on the body indicated a shot from close range. Gietzen was not permitted to give the jury his opinion about the significance of soot being present in the abdominal wound but not in the neck wound, but as the State points out, the pathologist who testified addressed this issue and provided the same information Defendant wanted to present through Gietzen—that one wound was a contact wound and one was inflicted from a longer distance. The pathologist testified that the difference in soot "would imply that the gunshot wound # 1 [neck] was farther away, the flesh was farther away from the muzzle of the gun than gunshot wound # 2 [abdomen]." He also agreed with defense counsel that the "belly" shot would have probably been within 12 inches and no more than 18 inches. As a result, the testimony Defendant desired was presented to the jury, with the exception of an opinion from Gietzen that June was lying.

■ "[T]he general rule is that expert testimony is inadmissible if it relates to the credibility of witnesses because it

invades the province of the jury." *State v. Link,* 25 S.W.3d 136, 143 (Mo. banc 2000). A witness may "testify to specific facts that discredit the testimony of another witness, as long as the witness does not comment directly on the truthfulness of another witness." *Id.* "[A]n expert witness may testify that he disagrees with the scientific conclusions reached by another expert witness." *Id.* at 144. In this situation, "the experts are merely disagreeing over the proper scientific conclusion which should be accorded a set of facts." *Stone v. City of Columbia,* 885 S.W.2d 744, 747 (Mo.App. W.D.1994).

Defendant wanted Gietzen to testify that he, an expert, had determined that June was lying about the shooting. Such testimony would have been improper as invading the province of the jury to determine June's credibility. *See Link,* 25 S.W.3d at 143. Thus, the trial court properly excluded any testimony from Gietzen that "the shooting could not have occurred the way June said it did." It was likewise improper for Gietzen to testify that June's statements were inconsistent with his own observations. Gietzen did not witness the event in question, and June was not reviewing the evidence as a scientist. The trial court then properly allowed defense counsel to *argue* to the jury in closing that the shooting couldn't have happened the way June said it happened.

The trial court did not abuse its discretion concerning the allowable scope of Gietzen's testimony. Point IV is also denied, and the judgment of the trial court is affirmed.

BARNEY, P.J., and LYNCH, J., Concur.